HANSEN, Plaintiff, v. CITY OF HAVRE, et al.,
Defendants.

(No. 8,217.)

(Submitted June 2, 1941. Decided June 16, 1941.)

[114 Pac. (2d) 1053.]

*Mr. Oscar C. Hauge,* for Plaintiff, submitted a brief, and argued the cause orally.

*Mr. Peter M. Rigg,* for Defendants, submitted a brief, and argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This is an original proceeding in this court for an injunction. The complaint sets out that the governing body of the defendant city created special improvement district No. 179 in the city of Havre for the purpose of constructing a diversion dam and necessary appurtenances, some within and some without the city limits, for the purpose of protecting the city from injury by the overflow of water from Bull Hook Creek and Scott Coulee; that the entire estimated cost of the proposed project chargeable against special improvement district No. 179 is the sum of $115,920.

The complaint further sets out that the city council passed a resolution providing for the issuance and sale of special improvement district bonds for the purpose of paying the costs and expenses to be incurred in making the proposed improvements; that the city council also passed and adopted a resolution or ordinance creating and establishing a special improvement district revolving fund, and created three other special improvement districts to take care of the city's share of the cost of the entire flood control project; that of the total cost of said project, $175,000 is the amount which must be paid by all of the im-

provement districts; that the defendant city applied to the Reconstruction Finance Corporation for a loan for the purpose of aiding it in financing the city's share of the cost of the project and the Reconstruction Finance Corporation has authorized a loan in the sum of $175,000 for such purpose, to be invested by it in the special improvement district bonds; that the city council has agreed with the Reconstruction Finance Corporation that to the extent permitted by applicable law, it would annually issue orders authorizing loans or advances from the revolving fund to any one or more of the four improvement districts, in amounts which would be sufficient to make good any deficiency in the bond and interest accounts of any one or more of the improvement districts.

The resolution creating district No. 179 declares that the purpose of the district in part is to acquire certain necessary real estate and rights-of-way, both within and without the limits of the city of Havre. It is alleged that the defendants threaten to and unless restrained will carry out the plans contemplated by the resolutions and ordinances and will create the proposed project and issue the proposed bonds. It is alleged that the resolutions, ordinances, contract and acts of the defendants are invalid and void, for several reasons which will hereafter be taken up in detail. The complaint seeks to enjoin the carrying out of the project. Facts are alleged showing a necessity for instituting an action originally in this court. The defendants have appeared by general demurrer and hence there are presented to us purely questions of law.

The first question raised is that the proposed bonds will create an indebtedness of the city within the meaning of section 6, Article XIII of the Montana Constitution. That section in part provides: "No city, town, township or school district shall be allowed to become indebted in any manner or for any purpose to an amount, including existing indebtedness, in the aggregate exceeding three (3) per centum of the value of the taxable property therein, to be ascertained by the last assessment for state and county taxes previous to the incurring of such indebtedness, and all bonds or obligations in excess of such

amount given by or on behalf of such city, town, township or school district shall be void.''

The special improvement district revolving fund was created pursuant to sections 5277.1 et seq., Revised Codes. It is made up of funds transferred from the general fund of the city or by the levy and collection of a tax on all the taxable property in the city. (Sec. 5277.2, Rev. Codes.) However, the moneys in the revolving fund are not chargeable with the payment of the bonds, but moneys used for that purpose from the revolving fund are merely loaned by the revolving fund to the district fund. (Sec. 5277.3.) And when such a loan is made the revolving fund has a lien as security for the loan. This is provided for by section 5277.4 which provides:

''Whenever any loan is made to any special improvement district fund from the revolving fund, the revolving fund shall have a lien therefor on all unpaid assessments and installments of assessments on such district, whether delinquent or not, and on all moneys thereafter coming into such district fund, to the amount of such loan, together with interest thereon from the time it was made at the rate, or percentage, borne by the bond or warrant for payment of which, or, of interest thereon, such loan was made; and whenever there shall be moneys in such district fund which are not required for payment of any bond or warrant of such district, or of interest thereon, so much of such moneys as may be necessary to pay such loan shall, by order of the council, be transferred to the revolving fund; and after all the bonds and warrants issued on any special improvement district have been fully paid, all moneys remaining in such district fund shall by order of the council be transferred to and become part of the revolving fund.''

And section 5277.5 authorizes any excess funds in the revolving fund to be transferred to the general fund of the city. It also authorizes the use of the excess funds in the revolving fund ''for the purchase of property at sales for delinquent taxes or assessments, or both * * * and against which property there then be any unpaid assessment for special improvements

on account whereof there are outstanding special improvement district bonds or warrants of the city or town." Likewise the proceeds from the sale of such tax certificates or from the sale or rental of properties so acquired shall belong to the revolving fund, and are subject to transfer to the general fund by virtue of section 5277.5. Hence, the possibility that part of the bonds may have to be paid with moneys obtained from the revolving fund which in turn is created by a tax levy on the property of the city does not create a city debt but is merely an arrangement whereby the city, through the revolving fund, loans money to the district, and for which it holds security in the form of a lien.

As above noted, the city council has agreed with the Reconstruction Finance Corporation that it will, to the extent permitted by law, issue orders authorizing loans or advances from the revolving fund to any one or more of the special improvement districts, in amounts sufficient to make good any deficiency in the bond and interest accounts of such improvement district. It should be pointed out that the proposed bonds are not obligations of the city, but of the special improvement district only, and payable only from the district fund. The revolving fund arrangement is merely a means whereby the district may borrow money to make up any deficiency. The revolving fund arrangement is similar in purpose to a plan in the state of Washington which came before the supreme court of that state in *Comfort* v. *City of Tacoma,* 142 Wash. 249, 252 Pac. 929, 931. In that case the contention was made that a similar arrangement amounted to the incurring of a city debt. The court approved the holding in the case of *Corey* v. *City of Ft. Dodge,* 133 Iowa, 666, 111 N. W. 6, as follows: "Where the city had provided for a special assessment for improvements which contemplated a probable deficiency, the amount thereof could not be considered as being an indebtedness within the meaning of the constitutional limitation."

The next point raised by plaintiff is that the notice of intention to create the special improvement district was not published as the law directs. It was published in the Havre

Daily News on each day from Tuesday to and including Saturday of the same week, which constituted all the publications of the paper for a week. The paper has no Sunday or Monday edition. Section 5227 provides that such a resolution "must be published for five days in a daily newspaper, or in some one issue of a weekly paper published in the city or town, or in case no newspaper be published in such city, then by posting for five days in three public places in the city or town." Section 5255 provides that resolutions required to be published, "shall be published in a daily newspaper or in a semiweekly or weekly newspaper, to be designated by the council of such city, as often as the same is issued during the period specified for said publication, and no other statute shall govern or be applicable to the publications herein provided for; provided, however, that in case there is no daily, semiweekly, or weekly newspaper printed or circulated in any such city, then such notices, resolutions, orders, or other matters as are herein required to be published in a newspaper, shall be posted and kept posted for the same length of time as required herein for the publication of the same in a daily, semiweekly, or weekly newspaper, in three of the most public places in such city except herein otherwise specifically provided."

The period for publication under section 5227 is five days. The notice was published for five consecutive days. Under section 5255, when publication is in a daily newspaper, the publication shall be "as often as the same is issued during the period specified for said publication." We have no difficulty in reaching the conclusion that the notice of intention to create the district was published in the manner required by law. It has been held that a newspaper published five days in the week is a daily newspaper in the popular sense. (*Fairhaven Pub. Co.* v. *City of Bellingham,* 51 Wash. 108, 98 Pac. 97, 16 Ann. Cas. 420.) We subscribe to that view.

Obviously the intention of the legislature was to permit posting of notice only when publication could not be made in the city. By using the words "daily," "semiweekly" or "weekly" the legislature made it plain that whenever there is a news-

paper published in the city, publication therein should take precedence over notice by posting. To hold otherwise we would be obliged to say that one publication in a weekly paper would be sufficient, and five publications in a newspaper published seven times a week would be sufficient, whereas five publications in a paper published only five times a week would be insufficient. Such a conclusion is not warranted by reason nor by the legislative intent gathered from the wording of the statute.

The next point raised is that section 5039.74, as amended by ▇ Chapter 180, Laws of 1937, does not authorize the city to condemn lands either within or without the city for rights of way for diversion canals, dams and appurtenances to protect the city from overflow. Section 5039.74, as amended, Chapter 180 of the Laws of 1937, provides: "The city or town council has power: To condemn private property for opening, establishing, widening, or altering any streets, alley, park, sewer or waterway in the city or town, and for establishing, constructing and maintaining any sewer, waterway or drain ditch outside of the corporate limits of the municipality, or for any other municipal and public use, and the ordinance authorizing the taking of private property for any such use is conclusive as to the necessity of the taking, and must conform to and the proceedings thereunder had as provided in the code of civil procedure concerning eminent domain."

The plan here is to fill in the present bed of Bull Hook Creek passing through the city, which is dry except in times of a flood, and by means of the contemplated project divert flood water from Bull Hook Creek and Scott Coulee into a channel where it will not flood or injure the city. When completed the project will be nothing more nor less than a "waterway or drain ditch" within the meaning of section 5039.74, as amended. Likewise under that section the city may condemn private property "for any other municipal and public use." This is sufficient statutory authority also to condemn private property outside a municipality for municipal and public use. To protect the inhabitants of the city and their property from flood waters is certainly a

project for municipal and public use within the meaning of section 5039.74, Revised Codes.

The next point raised is that our statutes do not permit the assessment of property in a special improvement district within a city for improvements made without the city or for the purpose of paying for condemned property without the city. As above pointed out, the purpose of the project in question is to control the flood waters within the special improvement district. The thing to be accomplished is improvement of conditions within the city and the improvement district. The fact that property must be acquired and the work performed outside the city is but incidental. The property to be benefited is not that outside the city but that within the city and within the improvement district.

Section 5226, Revised Codes, actually contemplates just such a project as the one involved here. It expressly authorizes the creation of an improvement district for the purpose of constructing "walls of rock or other material to protect the streets, avenues, lanes, alleys, courts, places, public ways, and other property in any such city from overflow by water; and to order any work to be done which shall be deemed necessary to improve the whole or any portion of such streets, avenues, sidewalks, alleys, or places or public ways, or property, or right of way of such city." Were express statutory authority lacking, there would still be implied authority to create improvement districts for such a project. The rule is stated in 44 C. J. 184, as follows: "While under the general rule it is generally held that a municipality has no power to make improvements outside of its own limits unless authority to do so is conferred either expressly, or by necessary and fair implication, yet authority to act beyond its boundaries is sometimes implied on grounds of special necessity. It is competent for the Legislature in the absence of constitutional restraint to grant a municipality extra territorial jurisdiction. * * * And such authority may be implied from a general power."

In 5 McQuillin on Municipal Corporations, 2d ed., section 1969, it is said: "Authority to make improvements beyond the

216

corporate limits is often implied on the ground of necessity, as sewer outlets, or, as it is said, it arises by implication. Improvements relating to a municipal purpose without the municipal area are generally sanctioned, as sewers and drains, parks and water supply." And it has been held that the city may construct a ditch to carry off surface water partly within and partly without the municipal boundaries. (*In re Town of Woolley*, 75 Wash. 206, 134 Pac. 825.)

Plaintiff argues that sections 5277.1 to 5277.5 are in conflict with section 1, Article XIII of the Montana Constitution in that they authorize a loan of city moneys and credit in aid of special improvement districts for the benefit of holders of bonds of the districts, are prohibited by section 1 of the Fourteenth Amendment to the United States Constitution as denying to plaintiff the equal protection of the laws, contravene section 26, Article V of the Montana Constitution as being special laws, and conflict with section 11, Article XII as authorizing a tax for private purposes.

All of these contentions were made and held groundless in the case of *Stanley* v. *Jeffries*, 86 Mont. 114, 284 Pac. 134, 70 A. L. R. 166. But it is contended that the *Stanley Case* involved facts where the improvements to be constructed were entirely within the corporate limits of the city, and, hence, that the case is not controlling here. This contention is without merit. From what we have already said, it is seen that this improvement is within the city though part of the project is without the city. What was held in the *Stanley Case* has equal application here.

Plaintiff's next contention is that section 5277.4 is in conflict with section 10, Article I of the United States Constitution as impairing the obligations of the contracts of the holders of the bonds of the district. Plaintiff contends that the lien of the revolving fund created by section 5277.4 is superior, senior and prior to the lien of the bondholders. This contention cannot be sustained. The only purpose of the revolving fund was to add to the security of the bondholders. It was not the intention of the legislature that the creation and use of the revolving fund should in any way impair the security of the

bondholders. The lien provided for by section 5277.4 was merely a plan by which the revolving fund might be reimbursed for loans made to the district out of funds of the district not required for payment of the bonds. This is made clear by the latter part of that section.

The next point raised by plaintiff is that the contract of the city that it would issue suitable orders authorizing loans or advances from the revolving fund to any one of the four districts to make good any deficiency in the bond and interest account is invalid because it attempts to bind the successors in office as to a discretionary matter. Under section 5277.3 it is provided in substance that when there is not sufficient money in the district fund to pay the bonds or interest thereon "an amount sufficient to make up the deficiency may, by order of the council, be loaned by the revolving fund to such district fund." Defendants contend that the word "may" as used in section 5277.3 means "must" or "shall." We think this contention must be sustained. We have often held that "may" means "must" or "shall," depending upon the apparent legislative intent. (*Montana Ore Purchasing Co.* v. *Lindsay,* 25 Mont. 24, 63 Pac. 715; *State ex rel. Interstate Lumber Co.* v. *District Court,* 54 Mont. 602, 172 Pac. 1030; *Rule* v. *Butori,* 49 Mont. 342, 141 Pac. 672; *State ex rel. Stiefel* v. *District Court,* 37 Mont. 298, 96 Pac. 337; *State* v. *Dotson,* 26 Mont. 305, 311, 67 Pac. 938; *Soliri* v. *Fasso,* 56 Mont. 400, 407, 408, 185 Pac. 322; *First National Bank of Helena* v. *Neill,* 13 Mont. 377, 382, 383, 34 Pac. 180; *Dryer* v. *Director General of Railroads,* 66 Mont. 298, 300, 213 Pac. 210.)

The legislature has made it mandatory for the city council to levy taxes for the purpose of raising sufficient money in the revolving fund to meet the financial requirements of such fund (section 5277.2), thereby recognizing that the revolving fund must meet certain requirements. In order to carry out the obvious legislative plan with respect to the revolving fund, we hold that it is mandatory that the city council use that fund for the purpose intended, and that it must make the orders directing loans from the revolving fund to the district funds when funds

are needed to make up any deficiency. This being so, the contract to do so does not bind successive officers to perform a discretionary act. The law makes the act mandatory irrespective of the contract.

Finally it is contended that interest cannot properly be considered a part of the cost of the improvement. The resolution of intention to create the district, and the resolution creating it, provide for the payment of interest on the proposed bonds as part of the cost of making the improvement at a rate not exceeding six per cent. per annum. The resolution providing for the issuance of the bonds and prescribing their form specifies that the rate of interest shall be six per cent. per annum. The contention is that since section 5249, as amended by Chapter 23, Laws of 1937, specifies that the interest rate shall not exceed six per cent. per annum, it is impossible to fix the rate definitely, and, hence, that interest cannot legally be considered a part of the cost of the improvement and a definite rate fixed. It was proper for the city by resolution to fix the definite rate of interest within the limit specified in section 5249.

Assessments may be made to include interest on money borrowed to make an improvement. (44 C. J. 647; and see *State ex rel. Griffith* v. *City of Shelby,* 107 Mont. 571, 87 Pac. (2d) 183.) Obviously the interest rate of the bonds is an important element considered in their sale, and when the rate was fixed within the limit provided for by statute, there can be no valid objection to including it as a part of the cost of the improvement, warranting the levying of assessments therefor.

Finding no merit in any of the contentions made by plaintiff, the relief sought is denied.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ERICKSON, ANDERSON and MORRIS concur.