MR. JUSTICE SHEEHY
delivered the Opinion of the Court.
In this case we determine and hold that the provisions of Section 17-6-308, MCA, which permit the use of in-state investment fund monies (Section 17-6-306, MCA) derived from taxation to guarantee loans or bonds of private individuals or private entities either directly or through the capital reserve account (Section 17-5-1515, MCA) or through the economic development guaranty fund (Section 17-5-1520, MCA) are unconstitutional from the viewpoint of our state constitution.
I.
This is an original proceeding in this Court, brought by John L. Hollow, a citizen, resident of Helena, Montana, and taxpayer, voter and property owner in this state. His action is brought under the Uniform Declaratory Judgments Act (Section 27-8-101, MCA, et seq.) for the purpose of obtaining from this Court a declaration that certain provisions of S.B. 349, Ch. 640, Laws of Montana (1985), enacted by the 49th Legislative Assembly are invalid as offending the State Constitution. We ordered responses from counsel representing the defendants, which responses were served and filed. Thereafter, oral argument was had before the Court on March 12,1986 concerning the contentions raised by the complaint and the responses.
There is no dispute between the parties as to whether this Court has jurisdiction to proceed, but in an original proceeding, we must, of course, find jurisdiction under our granted powers. To be sure about it, the same facts and factors that excited our acceptance of original jurisdiction and caused us to find standing for the taxpayer in Grossman v. State Department of Natural Resources (Mont. 1984), [209 Mont. 427,] 682 P.2d 1319, 41 St.Rep. 804, are present in this case. Here Hollow challenges the constitutionality of various aspects of the in-state investment program; the issuance of bonds by the state under the program is delayed because underwriters or investors who would purchase bonds require a final court reso *480 lution of the constitutional issues involved; the program involves major segments of the state’s population, and has great impact upon its economy; requiring the case to proceed first to the District Court and then here on appeal for a final resolution will require a lapse of time almost intolerable; and the proceedings here are designed to obtain a final judgment on the validity of the bonds which might be issued thereunder, so if valid, the bonds would be marketable. As we stated in Grossman, the issues here are fairly stated, fully explored and vigorously contended so that we have a justiciable controversy suitable for final resolution. Therefore we assume jurisdiction.
II.
The Montana Economic Development Board was created by Section 2-15-1805, MCA; its individual members at the time of the complaint here are the defendants McKittrick, Snider, Sullivan, Brown, Locke, Orth, and Schutte. The Board is administratively attached to the Montana Department of Commerce, an administrative agency of the state which is directed by the defendant Colbo. The Board is purporting to and intends to issue bonds within the limits prescribed by S.B. 349 (the title of the legislation in the legislature; we will refer as we proceed in this discussion to pertinent parts of S.B. 349 as the said parts are now enumerated in the code sections of the Montana Codes Annotated). The Board adopted a resolution on August 8, 1985 declaring its intention to issue the total principal amount of bonds permitted under the legislation. However, the Board has been advised by its bond counsel that there are several constitutional issues raised by the legislation which have not been specifically addressed by this Court in prior decisions and that a final resolution of those issues would be required by the investors to effectuate the sale of bonds issued by the Board.
III.
A short statement of what S.B. 349 accomplished is that the legislation authorized the Board to utilize the in-state investment fund to guarantee loans or bonds otherwise authorized to be made or issued by the Board under the provisions of the Montana Economic Development Bond Act, the Municipal Finance Consolidation Act, or the Montana Health Facility Authority Act; and to make and agree to make loans from the in-state investment fund to the capital *481 reserve account and guarantee funds which secure certain bonds issued by the Board.
While that short statement may suffice to advise the reader of the effect of the legislation, it does not begin to lead the reader through the maze of statutory provisions attending the activities of the Board. These we must explore in some detail for background to our decision here.
The legislature adopted the “Montana Economic Development Bond Act of 1983” (Section 17-5-1501, MCA et. seq.) for the purposes of promoting the general welfare of the people of the state, to increase job opportunities, and to retain existing jobs by making available funds for industrial, commercial, agricultural and other uses for economic development. The Board was given power to issue bonds and notes for “projects” and “major projects” (Section 17-5-1506, MCA) and to maintain necessary accounts (Section 17-5-1514, MCA). One of such accounts is the capital reserve account, of which more later.
The Board was also given power to engage in a project guarantee program (Section 17-5-1519, MCA) and to guarantee payments required by a loan, lease, or other credit arrangement for any project funded as authorized. Particularly with respect to its guarantee program, the Board was also empowered to create an economic development guarantee fund (Section 17-5-1520, MCA).
IV.
The capital reserve account established by the Board is provided in Section 17-5-1515, MCA. It consists of funds appropriated and made available by the state for the purposes of the account, proceeds from the sale of notes or bonds to the extent provided in the resolutions or indentures of the Board authorizing their issuance and such other funds as may be available from other sources.
Funds held in the capital reserve account must be used solely for the payment of principal of or interest on bonds secured by the account and must be maintained in a minimum amount sufficient to meet obligations of principal, interest and redemption premiums and debt service for such bonds and notes.
No bonds issued by the Board, and funded through the capital reserve account are a debt, liability or obligation of the faith and credit of the state, but are payable solely from the revenue or assets of the Board (Section 17-5-1523, MCA). Nonetheless, the governor *482 must include in the executive budget submitted to the legislature any sums required to restore the capital reserve account to the sum of minimum capital reserve requirements (Section 17-5-1516, MCA). This latter provision is denoted the “moral obligation” clause.
V.
The Board is further empowered to establish a project guarantee program (Section 17-5-1519, MCA). The Board may make commitments to guarantee payments required by a loan, lease or other credit arrangement for any project funded under the Montana Economic Development Bond Act, or under industrial development projects as outlined in Section 90-5-101, MCA, et seq. To fund this program, the Board is authorized to create an economic guarantee fund (Section 17-5-1520, MCA). It consists of insurance fees, premiums and other revenue and assets as the Board considers necessary to comply with any contract or agreement entered into by the Board and of borrowings up to $7.5 million from any available state funds.
Funds in the Economic Development Guarantee Fund must be used to satisfy any claim resulting from a defaulted loan, lease or any other credit agreement. Once again the credit of the State is not pledged with respect to this fund but the governor is required to include in the executive budget submitted to the legislature sums required to restore the economic guarantee fund to the minimum reserve requirements, which is an amount not in excess of the aggregate annual payments due under the loans, leases, or other credit agreements guaranteed by the Board (Sections 17-5-1520(3),(4), MCA).
The projects for which the funds produced by Economic Development Bonds may be used are broadly defined. A “major project” is one whose cost or appraised value exceeds $800,000 (Section 17-5-1503(6), MCA). Otherwise a “project” means, under Section 17-5-1503(7), MCA, those projects outlined in Section 90-5-101(6), MCA, which follow:
“ ‘Project’ means any land; any building or other improvement; and any other real or personal properties deemed necessary in connection therewith, whether or not now in existence, which shall be suitable for use for commercial, manufacturing, agricultural, or industrial enterprises; recreation or tourist facilities; local, state, and federal governmental facilities; multifamily housing, hospitals, long-term care facilities, or medical facilities; small-scale hydroelectric *483 production facilities with a capacity of 50 megawatts or less; and any combination of these projects.”
VI.
The provisions of S.B. 349 that create constitutional problems, as we view it, arise out of the use of the in-state investment fund.
The 1972 Montana Constitution, in Art. VIII, Section 13, directs that the state engage in a unified investment program. Accordingly, Section 17-6-201, MCA, directs that public funds be administered by the Board of Investments and the Montana Economic Development Board. The power of the Board of Economic Development, however, is limited to investment of the in-state investment fund (Section 17-6-201(4), MCA).
The Montana in-state investment fund is derived partly from the taxation of the severance of coal in Montana. The Montana in-state investment fund consists of (1) 25% of the revenue deposited after June 30, 1983 into the permanent coal tax trust fund established in Section 17-6-203(5), MCA; (2) the principal payments on all investments made from the Montana in-state investment fund; and, (3) 15% of the annual income and earnings on the Montana in-state investment fund appropriated to the coal severance permanent fund by Section 17-5-704(2), MCA. (Section 17-6-306, MCA.)
At this point, it is necessary to set out in full the perimeters of Section 17-6-308, MCA, respecting authorized investments of the instate investment fund. The statute follows:
“(1) The Montana in-state investment fund must be invested as authorized by rules adopted by the board. For purposes of this section, ‘investment’ includes the guaranty of loans or bonds in consideration for a fee, in lieu of the actual acquisition of such loans or bonds.
“(2) The board may use the in-state investment fund to guarantee loans or bonds issued under the provisions of 17-5-1501 through 17-5-1529, Title 17, Chapter 5, part 16, or Title 90, Chapter 7. Each guaranty must be given in consideration of a fee. The fees must be paid to the board. The guaranty must provide directly or by separate agreement that the board is fully subrogated to the rights of the obligee under the loan or bond. The board shall by rule establish the maximum ratio between guaranty funds available and loans or bonds to be guaranteed. The board may covenant in bond issues to maintain such ratio. Unless bonds issued to finance a project are *484 secured by a common capital reserve account and a common guaranty fund, the maximum amount of the guaranty authorized by this section may not exceed $3,000,000 with respect to the bonds or loans to finance the project.
“(3) The board may make loans from the in-state investment fund to the capital reserve account created pursuant to 17-5-1515 and the guaranty fund created pursuant to 17-5-1520 to establish balances or restore deficiencies therein. The board may agree in connection with the issuance of bonds or notes secured by such account or fund to make such loans. Loans must be on such terms and conditions as the board determines and must be repaid from revenues of the board realized from the exercise of its powers under 17-5-1501 through 17-5-1529, subject to the prior pledge of the revenues to the bonds and notes.”
Under S.B. 349, the legislature in 1985 amended subdivision (1) of Section 17-6-308, MCA, to provide that an “investment” includes the guaranty of loans or bonds in consideration of a fee, in lieu of the actual acquisition of such loans or bonds. Such a provision did not exist prior to the amendment to define an investment.
The concept that undertaking to guaranty the private debt or obligation of another is an “investment,” is peculiar, to put it mildly. It is akin to co-signing a note at the bank for a friend, which as Shakespeare noted, “oft loses both itself and friend.” The defendants contend that guaranties on loans authorized under the statutes here are nothing more than additional types of investments and that the act of investing by guaranty does not create a debt on the part of the state. They rely on an informal opinion of the Montana Attorney General to that effect, and on provisions of Section 17-6-308, MCA that the guaranty must be given in consideration of a fee; that it must provide that the Board is subrogated to the rights of the obligee; that there must be a maximum ratio between guaranty funds available and loans to be guaranteed; that the maximum amount of the guaranty may not exceed $3 million in any project unless the bond is secured by a common guaranty fund and that the loans must be repaid from the revenues of the Board.
An “investment” is defined in Webster’s New Collegiate Dictionary (1981 ed.) as “the outlay of money usually for income or profit; a capital outlay.” When an investment is by guaranty, the outlay will come when the project has failed or the income is lost. A guarantor agrees to answer for the debt, default or miscarriage of another. Section 28-11-101, MCA.
*485 The provisions of Section 17-6-308, MCA, which permits the Board to establish a maximum ratio between guaranty funds available and loans to be guarantied have prompted the Board to adopt by resolution an administrative rule, A.R.M. Section 8.97.413, which reads in pertinent part:
“(2) The total principal amount of loans guarantied under A.R.M. 8.97.410 and bonds guarantied under 17-6-308(1), MCA, and of outstanding loans and obligations to make loans to the Capital Reserve Account and Guaranty Reserve Account shall not exceed, as of the date of the guaranty, loan or obligation, eight times the Guaranty and Loan Base.
“(3) The Guaranty and Loan Base shall, at the time of determination, be an amount equal to 25% of the current market value of all assets of the board in the Investment Fund.”
Thus, the potential liability of the state is for the full amount of all guaranties made by the Board which can be as great as two times the amount of the in-state investment fund. In a worst case scenario, guaranty holders may look to the state for full satisfaction for when “the legislature validly acts to establish a debt under Art. VIII, Section 8, that indebtedness becomes a state obligation extending over the life of the indebtedness, and every succeeding legislative assembly has an unavoidable duty to provide for it, in the manner required by the authorizing law.” Grossman, 682 P.2d at 1332, 41 St.Rep. at 819-20.
The strictures which protect the credit of the state with respect to bonds issued by the Board are not present with respect to the use of the in-state investment funds under Section 17-6-308, MCA. With respect to bonds, Section 17-5-1523, MCA, provides that such obligations do not constitute a debt, liability, obligation or pledge of the faith or credit of the state. To the contrary, under Section 17-6-308, MCA, the Board may use the in-state investment fund to pay obligations of guaranty of loans or bonds. In so doing, the Board would apply that portion of the in-state investment fund that derives from 25% of the coal severance tax revenues provided in Section 17-6-306, MCA. When such funds are used to satisfy guaranties of private debts or obligations its use offends Art. VIII, Section 1 of the Montana Constitution which provides taxes shall be levied by general laws for public purposes; Art. V, Section 11(5) that no appropriation shall be made for industrial or benevolent purposes to any private individual or private corporation not under the control of the state; and Art. VIII, Section 13(1), providing for a unified investment pro *486 gram, insofar as Section 17-6-308, MCA allows guaranties of private obligations as permissible investments. See Veteran’s Welfare Commission v. V.F.W. and D.A.V. (1963), 141 Mont. 500, 379 P.2d 107.
In like manner, the provisions of subdivision (3) of Section 17-6-308, MCA, are constitutionally impermissible. Under that subdivision, the Board may make loans from the in-state investment funds to the capital reserve account we have described above and the economic guaranty fund also described above to establish balances or restore deficiencies therein. The loans are repayable from revenues of the Board realized from the exercise of its power and the issuance of bonds but subject to the prior pledge of the revenues to the bonds and the notes.
As we noted, under Section 17-5-1523, MCA, the credit of the state is not pledged to secure the bonds issued by the Board. Section 17-6-308(3), MCA, sidesteps that provision by providing that the Board may agree in connection with the issuance of bonds to make loans out of the in-state investment fund to the capital reserve account and the economic guaranty fund. The effect is, without the further action of the legislature, that tax monies derived from the coal severance tax will be loaned from the in-state investment fund and used to secure the obligations of the bonds. Such a procedure impermissibly offends the same provisions of the constitution we have referred to above.
This Court is aware that in Huber v. Groff (1976), 171 Mont. 442, 558 P.2d 1124, we held that the credit of the state was not pledged under the provisions of the Montana Housing Act of 1975. That act provides that the Board of Housing may issue bonds for the purchase of loans used for housing from banks and other financial institutions. We were careful to point out in Huber, however, that the act specifically said that the credit of the state was not pledged as security of the bonds so issued, even though there was a “moral commitment” much as we have at the case at bar, that the governor would request the legislature to appropriate necessary funds to supplement the reserve accounts. That avenue of redress for deficiencies, if any exist, in the capital reserve account and the economic development bond fund is still open under this decision. What we do not and cannot condone is the direct use of tax monies by legislative provision which in effect directly pledges the credit of the state to secure the bonds involved in this case.
*487 VI.
There are a number of other issues raised by Hollow in his complaint, but what we have said foregoing is sufficient to demonstrate that the use of the in-state investment fund as provided in Section 17-6-308, MCA, is constitutionally impermissible. We will not undertake to discuss the other issues raised by Hollow.
This opinion shall be and constitute a declaratory judgment in favor of Hollow to the effect that the use of in-state investment funds to guaranty loans or to make loans to the capital reserve account and the economic guaranty fund as provided in Section 17-6-308, MCA, is invalid under the Montana Constitution. This opinion, without the filing of further instruments or orders shall be and constitute such a declaratory judgment.
Except for activities related to the in-state investment fund, nothing in this opinion affects the validity of state actions through the capital investment fund or the economic development guaranty fund. Under Huber, supra, the “moral commitment” statutes of the latter two funds do not constitute a pledge of the state’s credit to underpin the funds.
MR. CHIEF JUSTICE TURNAGE and MR. JUSTICES HARRISON, WEBER, GULBRANDSON and HUNT concur.