NO.    93-145

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

CARBON COUNTY,

     Plaintiff and Respondent,

   v.

DAIN BOSWORTH, INCORPORATED, a Delaware
Corporation, et al., and D.A. DAVIDSON & CO.,
KAREN T. DOOLEN and FRANK and MARGO KELLEY,
as representatives of the Bondholder Class,

     Defendants and Appellants,

   v.

CARBON COUNTY,

     Plaintiff and Respondent,

   and

DON TAYLOR, MONA L. NUTTING
and JOHN PRINKKI,

     Respondents and Respondents.

FILED

MAY 1 6 1994

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the First Judicial District,
               In and for the County of Lewis and Clark,
               The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

     For Appellants:

          Keith Strong (argued) and Bruce A. MacKenzie
          (argued), Dorsey & Whitney, Great Falls,
          Montana; and James H. Goetz (argued), Attorney
          at Law, Bozeman, Montana (for the Underwriters)

          Robert M. Murdo (argued), Jackson, Murdo,
          Grant & McFarland, Helena, Montana (for
          the Bondholder Class)

For Respondent Carbon County:

Ward Swanser (argued) and T. Thomas Singer (argued), Moulton, Bellingham, Longo & Mather, Billings, Montana; and Anthony Kendall, Carbon County Attorney, Red Lodge, Montana

Submitted: April 18, 1994

Decided: May 16, 1994

Filed:

Clerk

Justice William E. Hunt, Sr., delivered the opinion of the Court.

Appellants appeal from an order of the First Judicial District Court, Lewis and Clark County, denying their motion for summary judgment and granting summary judgment to plaintiff Carbon County, finding that the County has no further obligation to make loans from the revolving fund to the rural special improvement district (RSID) fund when the RSID assessments are insufficient to pay the RSID bonds. Respondents are the present Carbon County Commissioners. Appellants are three underwriters, Dain Bosworth, Inc., D.A. Davidson & Company, and Piper Jaffray & Hopwood, Inc., and numerous bondholders.

We reverse the District Court's order for summary judgment and remand for further proceedings in accordance with this opinion.

While many issues are raised by the parties, we need not discuss them because the dispositive issue on appeal is whether a county is required to continue to levy general taxes and loan money to an RSID revolving fund created pursuant to § 7-12-2181, MCA, when the RSID is deficient, and the revolving fund may never be sufficient to retire the bonds, and the county's loans may never be repaid.

In 1984, when a developer called Joint Venture petitioned Carbon County to approve a subdivision plat to develop a country club subdivision and golf course known as Red Lodge Country Club Estates, the then-seated County Commissioners required that Joint Venture construct street, water, and sanitary improvements. The County Commissioners agreed to help finance these improvements.

After notice requirements were met under § 7-12-2105, MCA, the County Commissioners created two RSIDs, 8 and 9, under § 7-12-2103, MCA. The County Commissioners authorized improvements totalling $2,244,000 for RSID 8, and $1,025,000 for RSID 9.

The County Commissioners agreed to issue bonds to the public to finance the improvements following the requirements found in §§ 7-12-2169 to -2175, MCA, and agreed to levy and collect assessments in the principal amount of the bonds against property within the RSIDs under §§ 7-12-2151 to -2168, MCA.

The County Commissioners also created a revolving fund under § 7-12-2181, MCA, and agreed to authorize loans or advances from the revolving fund to the RSID fund when assessments are deficient to pay the bond payments. To replenish the revolving fund, § 7-12-2182(1)(a), MCA, provides that county commissioners may loan monies from the general fund to the revolving fund as may be necessary, and § 7-12-2182(1)(b), MCA, allows the County to levy a tax on all taxable property within Carbon County "as shall be necessary to meet the financial requirements of such fund." The tax levy is subject to the limitations in § 7-12-2182(1)(b), MCA, requiring that the tax may not be an amount that would increase the balance in the revolving fund above five percent of the principal amount of the then-outstanding RSID bonds. When the revolving fund makes a loan to the RSID fund, a lien up to the loan amount attaches to the following: all RSID property which is delinquent in assessment payments: all unpaid assessments whether delinquent or not; and all money deposited into the RSID fund. Section

4

7-12-2184(1), MCA. The liens may be enforced by the sale of the property at a tax sale. Section 7-12-2184(2), MCA.

The County Commissioners published notice of the bond sale stating it would create, use, and fund a revolving fund if assessments were insufficient until all the bonds and interest thereon are fully paid. Because the bonds did not sell initially, the County Commissioners agreed to sell the bonds to Dain Bosworth, Inc., D.A. Davidson, Piper Jaffray & Hopwood, Inc. (underwriters), who in turn sold the bonds to the public. The bond purchase agreement between the County Commissioners and the underwriters restates the promise to use and maintain the revolving fund. The RSIDs were recreated, and again, the County Commissioner's resolution made the following promise to create, use, and fund a revolving fund:

> [T]his Board does hereby undertake and agree . . . to secure the Bonds with the Revolving Fund and to issue orders annually authorizing loans . . . in the amounts sufficient to make good any deficiency in the District Fund, to the extent that funds are available, and to provide funds for the Revolving Fund by annually making a tax levy or loan from the General Fund, subject to the maximum limitations imposed by the Montana Code Annotated, Section 7-12-2182. Specifically, this Board shall annually or more often if necessary issue an order authorizing a loan or advance from the Revolving Fund to the District Fund in an amount sufficient to make good any deficiency then existing in the Interest Account in the District Fund, and shall issue an order authorizing a loan or advance from the Revolving Fund to the District Fund in an amount sufficient to make good any deficiency then existing in the Bond Account of the District Fund to the extent that moneys are available in the Revolving Fund.

Joint Venture agreed with the underwriters to provide additional security through covenants to: (1) guarantee the bond

5

payments in 1985 and 1986 with two letters of credit: (2) pay the assessments on all developer owned land from 1987 to 1992; (3) pay a substantial portion of the unpaid assessments after 1992; and (4) remain in existence until it sold its assets to a buyer worth $16 million or more. However, in order to keep the tax exempt status of the bonds, the County waived section (2) of the security agreement whereby Joint Venture would pay all assessments on all developer owned land through 1992.

The bonds were prepared according to the form set out in § 7-12-2170, MCA (repealed 1989). The underwriters advertised to the public that the bonds were for sale and were secured by the revolving fund. Numerous people bought the bonds totalling over $3 million. The issued bonds were arranged for interest to mature on January 1, 2000, bearing interest at annual rates from 7.5 percent to 12.625 percent payable on each January 1, commencing January 1, 1985. Additional interest would be paid for a limited time ending January 1, 1986.

The property improvements were made using the bond proceeds. The RSID property did not sell as expected, and of the property that did sell, the assessments became delinquent resulting in inadequate revenue to pay the bond payments. Under § 7-12-2184, MCA, the County used its authority to sell two lots of the 150 delinquent lots at a tax sale. Bond payments on January 1, 1985, 1986, and 1987, were paid from the following: bond proceeds remaining after improvements were completed; the few assessments paid: and one of two letters of credit from Joint Venture. Tax

6

levies to replenish the revolving fund became necessary for the payments on January 1, 1988, 1989, and 1990. Since January 1, 1990, the newly-seated County Commissioners refused to loan funds from the revolving fund, asserting that the loans would be unsecured because the current value of the RSID property is less than the delinquent and future assessments against them.

On December 31, 1990, the County Commissioners filed action for a declaratory judgment defining the County's obligation under the bonds, the revolving fund laws, and the Montana Constitution.

In February 1992, the underwriters and bondholders, and the County filed cross-motions for summary judgment. The underwriters and bondholders also filed two motions in limine challenging the relevance of evidence concerning current property values of the RSID property, and challenging the relevance of Joint Venture's agreement to provide further security. On February 10, 1992, during the pendency of this action in state court, Joint Venture filed its petition for Chapter 11 bankruptcy. The Bankruptcy Court held a hearing on February 16, 1994, on debtor Red Lodge County Club Estates Joint Venture's fourth amended plan of reorganization, together with objections filed by Carbon County, and Northwest Capital Management and Trust Company. Each party was represented by counsel. The Bankruptcy Court issued its order on January 7, 1994, conditionally approving debtor's third amended disclosure statement, and set February 10, 1994, as the last day for a party-in-interest to file objections to the disclosure statement. No objections were filed, and the Bankruptcy Court issued its order

confirming a Chapter 11 amended plan of reorganization for debtor on February 28, 1994.

In its order, the Bankruptcy Court said:

Once the bondholders agree to accept their payment proposed under the Plan, as is the case, then all legal claims of the bondholders against R.S.I.D. Nos. 8 and 9, as well as lien rights of Carbon County involving the Debtor's property, are extinguished.

The Bankruptcy Court further said:

The bondholders, like Carbon County, are only secured up to the value of the Debtor's R.S.I.D. property. 11 U.S.C. § 506(a). Whether that value, pegged at $1,321,011.11, is said to pay assessments or principle or interest, is unimportant. The plan payment is in full satisfaction of all bondholder's indebtedness against the R.S.I.D. property of the Debtor because all lien rights of both Carbon County and the bondholders are being extinguished.

The debtor owned more than 75 percent of the property in the RSID, and as to the property that the debtor owned, all liens were extinguished. The Bankruptcy Court's order did not affect the obligations of non-Joint Venture property, and the legal issues posed for this Court remain the same for the property within the RSID not affected by the Bankruptcy Court's order.

On February 4, 1993, the District Court denied the underwriters' and bondholders* motion challenging property value evidence, left undecided the motion concerning the agreement to provide further security, and granted summary judgment in favor of the County. The underwriters and bondholders appeal.

Is a county required to continue to levy general taxes and loan money to an RSID revolving fund created pursuant to § 7-12-2181, MCA, when the RSID is deficient, and the revolving

3

fund may never be sufficient to retire the bonds, and the county's loans may never be repaid?

Rule 56(c), M.R.Civ.P., provides that summary judgment should be granted when the record does not contain any genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The scope of review for a suit that is disposed of by summary judgment by a judge where the facts are uncontested, is broader than in other appeals, and this Court may examine the case and reach a conclusion according to our findings. District No. 55 v. Musselshell County (1990), 245 Mont. 525, 527, 802 P.2d 1252, 1253.

The underwriters and bondholders contend that although the District Court acknowledged that the revolving fund laws provide that the County was obliged to make the loans, it ignored the laws when it found that the County Commissioners are not required to make further payments from the revolving fund. The County Commissioners assert that the purpose of the revolving fund was to provide short-term secured loans; it was not intended to be a guarantee of partial payment.

When analyzing statutory law, courts look first to the plain meaning of the words used in the statute, and if that is unclear, then courts look to legislative history. State ex rel. Roberts v. Public Service Commission of Montana (1990), 242 Mont. 242, 246, 790 P.2d 489, 492. If the statute's language is plain, unambiguous, direct, and certain, the statute speaks for itself. Blake v. State (1987), 226 Mont. 193, 198, 735 P.2d 262, 265.

9

The County was following a well-established process in Montana when it created the RSIDs and financed the improvements by selling bonds, and when it authorized the use of the revolving fund.

In 1913, the Legislature first authorized cities to create special improvement districts (SIDs). Laws 1913, Ch. 89. In 1915, the Legislature authorized the counties to create rural special improvement districts. Laws 1915, Ch. 123. Prior to 1929, special assessments were the only source of payment for the bonds, and when these assessments were delinquent, many bonds were never paid. Two problems arose: first, bonds matured sequentially, therefore, the failure to pay bond payments placed the entire bond offering into default: second, when property assessments were delinquent and the city sold the property at a tax sale, statute provided that when the tax deed was issued, all liens were extinguished. Once the liens were extinguished, the city had no right to collect delinquent SIDs, and consequently, bonds were not paid in full. In 1929, the Legislature mandated that cities create an SID revolving fund to secure the prompt payment of bonds when interest becomes due. Laws 1929, Ch. 63, § 1.

Before 1983, § 7-12-2181, MCA (1981), also required that any county creating an RSID "shall . . . create, establish and maintain . . . [a] revolving fund." (Emphasis added). The section was amended in 1983 to read that a county "may . . . create, establish and maintain" (emphasis added) a revolving fund, making the revolving fund voluntary. The Legislature also added a final sentence to the section providing:

10

> Nothing herein shall authorize or permit the elimination of a revolving fund until all the bonds and warrants secured thereby and the interest thereon have been fully paid and discharged.

Section 7-12-2181, MCA (1993).

In 1983, the Legislature amended § 7-12-2181, MCA, to allow the counties to have a revolving fund. The sponsor stated in testimony in support of his Bill:

> Our present laws that establish bonds for SIDs and RIDs have a revolving fund requirement that the whole tax paying area is actually responsible for the payments of those bonds. When you get into a period like we're in now when payments are not being made, then the county has to levy a property tax on the whole district to make those bond payments. This is an alternate type of bond. It would limit the obligation to the district where the improvement is being made. There would be no general taxing backup of these bonds. It would not affect the existing law but it would create a new section for a new type bond. Any developer who comes in is getting a cold shoulder because the city does not want to extend itself any further. This would say, if you can find a market for your bonds they will still have a tax exempt feature and it would not fall back on the general taxpayer, it would only be an obligation to that district.

Hearings on H.B. 872 Before the Local Govt. Committee, Montana 48th Legislature, at 4 (1983) (Statement of Representative Walter Sales, sponsor of H.B. 872).

Once the bonds are issued with the agreement to use the revolving fund, the Legislature, in § 7-12-2185(2), MCA, provided the following:

> The undertakings and agreements shall be binding upon said county so long as any of said special improvement district bond or warrants so offered or any interest thereon remain unpaid.

Nothing in the statutes voids the commitment to loan from the revolving fund if the RSID becomes deficient. We conclude that the

11

plain meaning of the Revolving Fund Law and the legislative history support the legislative intent to allow counties to choose whether to finance the districts by issuing bonds secured by the revolving fund. Here, the County Commissioners agreed to the revolving fund obligation and issued bonds secured by the revolving fund. The District Court quoted §§ 7-12-2185(2) and -2181, MCA, and found that "[t]he language of these statutes is clear that the County is required to continue funding the revolving fund and to continue making loans to the district funds so long as the bonds and interest remain unpaid."

Because it is the obligation of the County to make loans from the revolving fund, and the obligation might never be paid, the District Court reasoned that this was in violation of the Montana Constitution prohibiting indebtedness past a certain percent. In Hansen v. City of Havre (1941), 112 Mont. 207, 114 P.2d 1053, and in Stanley v. Jeffries (1929), 86 Mont. 114, 284 P. 134, we held that this procedure is constitutional.

The District Court found that the loans from the revolving funds to the deficient RSIDs are incurring additional debt to the County, violating § 7-7-2101(2), MCA (1984), which considered void any bonds in excess of $150,000 without a majority vote by voters. The court found that although notice must be published in the local newspaper of the County's intention to create an RSID, it is mailed only to real estate owners within the proposed district, therefore, the property owners outside the districts have no notice to protest the creation of the district or the bond issuance that they may be

12

required to pay.  The court stated that neither <u>Stanley</u>, nor <u>Hansen,</u> applies because neither decision addresses the question of the county's obligation to make loans to an RSID when it has defaulted on the bonds and loans from the revolving funds are insufficient to cure the default.

<u>Hansen</u> decided the constitutional question concerning debt limit and the revolving fund.  The <u>Hansen</u> Court found that special improvement district bonds secured by a revolving fund do not constitute indebtedness of the city within the Montana Constitution, Article XIII, Section 6 (1889), which provided at that time that no city shall be allowed to become indebted, in any manner or purpose, in the aggregate exceeding three percent of taxable property value therein.  <u>Hansen,</u> 114 P.2d at 1056.  The revolving fund is not chargeable with the bond payments, but makes loans to the district fund secured by a lien on property in the district.  <u>Hansen,</u> 114 P.2d at 1056.  Although the revolving fund may pay part of the bonds, and the revolving fund is replenished by a tax levy on property within the city, this does not create a city debt, but is merely a loan arrangement to meet possible deficiencies in the district fund whereby the city loans money from the revolving fund.  <u>Hansen,</u> 114 P.2d at 1056.

The District Court treated the bonds as general obligation bonds because the County must continue to make loans from the revolving fund and levy taxes to replenish the fund.  However, a general obligation would mandate that the bonds be paid when due from the County's available funds, and if funds are insufficient,

13

from tax levies upon all taxable property within the County. Sections 7-7-2205 and -2206(4), MCA. On the other hand, special improvement bond obligations are limited to the district funds, and if necessary, receive loans from the revolving fund. If both funds are insufficient to meet bond payments, there is no other source to pay the bonds. The revolving fund levies are limited to an amount that would increase the balance in the fund to no more than five percent of the principal amount of the outstanding bonds under § 7-12-2182(1)(b), MCA. The bonds are still special, limited bonds. We hold that the District Court erred in its application of Hansen when it cited that decision for support that the County is relieved of its obligation to make loans to the RSIDs.

The bondholders and underwriters argue that the District Court also misapplied Stanley, which states any loss associated with the bonds falls upon the bondholders and not the city. They also contend the court erred when it relied on Griffin v. Opinion Publishing Company (1943), 114 Mont. 502, 138 P.2d 580, for support that any loss caused by delinquent assessments falls upon the bondholders and not the County.

In Stanley, two challenges were present. The first challenge concerned bonds issued after the revolving fund statutes were enacted and secured by the revolving fund. The second challenge concerned bonds issued before the revolving fund statutes were enacted. This Court held that the bonds issued before the revolving fund laws were enacted were not secured by the revolving fund, and any loss falls upon the bondholders and not the city.

14

<u>Stanley,</u> 284 P. at 139-40. In <u>Griffin,</u> the issue was whether a newspaper article questioned the source of payment for SID bonds and the truth of the article. In analyzing the article's truth, the court said SID bonds were not an obligation of the city. <u>Griffin,</u> 138 P.2d at 588.

Here, the County contends that the bondholders are private parties and the obligation to make loans from the revolving fund to repay the bonds is an unconstitutional guaranty of a private party's obligation in violation of Article VIII, Section 1, of the Montana Constitution, requiring that state funds be used for public purposes.

This Court has consistently upheld the revolving fund law as constitutional when it authorizes a loan or donation of public revenues for the benefit of bondholders in payment for the special improvements in a district, whereby bonds are secured by the revolving fund.

Although bondholders will profit by the revolving fund law, the provision will partly avoid the past scenario where bondholders suffered the loss when a certain percent of property owners fail to pay the property assessments. <u>Stanley,</u> 284 P. at 138. The <u>Stanley</u> Court stated:

> [T]he laying out and improvement of streets, alleys, sewers and the like is essentially a public purpose benefitting the entire community, although the work is done in but a portion of the city, and . . . each portion of the city might be thus improved at the general public expense, and no taxpayer could be heard to complain thereof. In other words, in order to erect any public improvement by the creation of special improvement districts, both general benefits to the municipality and special benefits to particular property must be

15

> conferred--the special benefit to adjacent property is but incidental to the general public: it could not otherwise lawfully be created . . . .
>
> . . . [T]he Legislature . . . might have, lawfully, imposed a much greater burden upon the municipality.

Stanley, 284 P. at 138-39. The public policy behind the SID statute was to build communities by creating districts within the city and providing improvements, and similarly, the policy behind RSIDs was to improve rural areas which also benefits the entire county. Stanley reveals that losses from delinquent assessments were contemplated, especially given the period in Stanley, where great losses to bondholders were likely because when a tax deed was issued, the unpaid assessment lien on the properties were extinguished, and the bonds issued before the revolving fund laws were enacted were not secured by the fund. Stanley, 284 P.2d at 139. Also, the city received no consideration for pledging the security, therefore, to make loans from the revolving fund would authorize a tax levy for a private purpose. Stanley, 284 P.2d at 139.

We hold that the loans from the revolving fund and subsequent tax levies are within the constitutional mandates of Article VIII, Section 1, of the Montana Constitution, requiring that state funds be used for public purposes.

The County relies on White v. State (1988), 233 Mont. 81, 759 P.2d 971, and Hollow v. State (1986), 222 Mont. 478, 723 P.2d 227, for authority to support its argument that the revolving fund and the obligation to tax county property owners to fund the revolving

16

fund is an unconstitutional pledge of credit. These decisions are distinguishable and do not apply to these facts.

White concerned a bill establishing a program empowering a special science and technology board to funnel bond proceeds into private business ventures through technology investments. This Court found that the statute required the Legislature to provide the difference between the board's return on the investment of bond proceeds and the bond obligations, which were used for the benefit of private businesses, and was, in effect, a direct pledge of the state's credit to secure bonds. White, 759 P.2d at 974. This Court denounced this pledge to secure bonds where the proceeds are to be used for the benefit of private businesses. White, 759 P.2d at 974. Here, the bond proceeds were used to benefit Carbon County by providing improvements to RSIDs within the County--not to private businesses.

For the same reason, Hollow does not apply because that decision also dealt with private debts and obligations. Hollow concerned an act that made an open-ended promise to loan coal severance tax revenues from an in-state investment fund to an economic guarantee fund, which was used to secure bonds for private economic development projects. Hollow, 723 P.2d at 232. Here, the RSIDs receive the benefit of the improvements, and the debt is charged to the district, not to the County. The County is obligated only to make loans to the district pursuant to the revolving fund laws and its agreements. The County receives an

17

asset in return, a loan receivable secured by a lien on the RSID property and the RSID fund for repayment.

We hold that the County's obligation to make loans from the revolving fund and the obligation to levy taxes to fund the revolving fund is not an unconstitutional pledge of credit.

The underwriters and bondholders assert that because the relationship between them and the County was contractual, and the County was authorized to enter into a contract to establish a revolving fund, this Court should enforce the contract.

Public bodies are as bound by their contracts as are private parties. State v. City of Helena (1952), 125 Mont. 592, 602, 242 P.2d 250, 255. Where the language is "clear and unambiguous there is nothing for the court to construe; the duty of the court is simply to apply the language as written to the facts of the case, and decide the case accordingly." Bain v. Williams (1990), 245 Mont. 228, 231, 800 P.2d 693, 695 (quoting Danielson v. Danielson (1977), 172 Mont. 55, 58, 560 P.2d 893, 894). In this case, both the County's resolutions authorizing issuance of the bonds, and the bond purchase agreement between the County and the underwriters, contain the County's promise to create, use, and fund a revolving fund subject to the maximum limitations in § 7-12-2182, MCA, if assessment payments were insufficient. The agreements are clear and unambiguous, and the parties had mutual understanding of the County's obligations.

The County freely entered into and agreed to the terms within the resolutions and the bond agreement. In fact, in April 1984,

18

the county passed a resolution to offer bonds with a revolving fund pledge. The revolving fund commitment made in the subsequent resolution on August 30, 1984, is nearly identical to the earlier resolution; the bonds were drafted pursuant to the requirements in § 7-12-2170, MCA (repealed 1989). Those who enter a contract are charged with the responsibility of acquainting themselves with the agreement terms, and those who execute a written contract are presumed to know its contents and terms; they cannot obtain relief unless they show ambiguity in the contract, misrepresentation, or bad faith. Johnson v. Estate of Shelton (1988), 232 Mont. 85, 90, 754 P.2d 828, 830-31.

The County was also seeking the benefits of the improvements of property and increased property values within the County. It used the security of the revolving fund to encourage people to buy the bonds. The bondholders relied on the promises to use the revolving fund. The County Commissioners, having exercised their discretion to institute the revolving fund, and having freely entered into an agreement with the bondholders and the underwriters, under both the statutes and terms of the agreement, are obliged to carry out their contractual obligations. The County's refusal to honor this agreement and authorize loans from the revolving fund is a breach of the contract.

Where the Legislature has provided the requirement to levy taxes to replenish the revolving fund to meet the requirements of this fund, it follows that it is mandatory that the revolving fund be used for the purpose intended-- to make loans to the district

19

fund to make up any deficiencies.  <u>Hansen</u>, 114 P.2d at 1059.  The Court in <u>Hansen</u> stated that under what was then § 5277.3, RCM (1937), providing that the city "may" make the loans from the revolving fund to the districts to make up any deficiencies, that "may" means "must" or "shall" according to the Legislature's intent: and, a  "contract to do so does not bind successive officers to perform a discretionary act" but makes the acts mandatory regardless of the contract.  <u>Hansen</u>, 114 P.2d at 1059.

With the exception of the liens and obligations that were against those lots owned by the debtor Red Lodge Country Club Estates Joint Venture at the time of the Bankruptcy Court's judgment and which were not previously sold or agreed to be sold by Joint Venture and that were extinguished by the Bankruptcy Court's order of February 28, 1994, we conclude that the County's agreement to make loans from the revolving fund is mandatory and not discretionary.   The County must continue to make loans to the revolving fund and must continue to levy taxes to replenish the revolving fund until the obligations  not extinguished by the bankruptcy proceedings are paid in compliance with § 7-12-2181, MCA.  Because the County receives a loan receivable secured by a lien on the RSID property when it makes a loan from the revolving fund,  the County has the option to dispose of the remaining delinquent assessment properties at a tax sale to acquire revenue for the bond payments.

20

Other issues were raised by the parties, but because of our holding on the issue discussed, we need not consider the other questions.

We reverse the District Court's order for summary judgment and remand for further proceedings in accordance with this opinion.

_William E Hunter_
Justice

We concur:

_J. A. Turnage_
Chief Justice

_John Conway Harrison_

_Karla M. Gray_

_Terry Trieweiler_

_Justices_

21