No. 87-557

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

ROBERT L. WHITE and BARBARA
M. WHITE,
          Plaintiffs,

   -vs-

THE STATE OF MONTANA; MONTANA
SCIENCE AND TECHNOLOGY DEVELOPMENT
BOARD, et al.,
          Defendants.

---

ORIGINAL PROCEEDING:

COUNSEL OF RECORD:

    For Plaintiffs:

        Patrick F. Hooks argued; Hooks & Budewitz, Townsend,
        Montana

    For Defendants:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Patricia Schaeffer, Asst. Atty. General, Helena
        James H. Goetz argued, Bozeman, Montana
        C. Brooke Dormire, New York, New York

---

Submitted: May 17, 1988

Decided: July 21, 1988

Filed: JUL 2 1 1988

_Ethel M. Harrison_
Clerk

Mr. Justice R. C. McDonough delivered the Opinion of the Court.

The plaintiffs seek an invocation of this Court's original jurisdiction for a declaratory judgment pursuant to §§ 27-8-101, et seq, MCA. The plaintiffs are residents, citizens, electors and taxpayers of Montana. The parties are seeking to determine the validity of House Bill No. 700, which was enacted by the Fiftieth Legislative Assembly and signed into law by the Governor on April 13, 1987.

Plaintiffs present ten issues for consideration by this Court:

1. Whether the Supreme Court has original jurisdiction.

2. Whether the plaintiffs have the requisite standing to maintain this action.

3. Whether HB 700 violates Article V, Section 11, paragraph (5) of the 1972 Constitution.

4. Whether HB 700 violates Article V, Section 11, paragraph (3) of the 1972 Constitution.

5. Whether HB 700 violates Article VIII, Section 1 of the 1972 Constitution.

6. Whether HB 700 unconstitutionally delegates legislative powers to the Montana Science and Technology Development Board.

7. Whether HB 700 fails to provide strict accountability required by Article VIII, Section 12 and thus also violates Article VIII, Section 13 of the 1972 Constitution.

8. Whether HB 700 violates Article IX, Section 5 of the 1972 Constitution.

9. Whether HB 700 contains a valid statutory appropriation.

10. Whether Section 27 of HB 700, the severability clause, can be applied.

We find and declare that House Bill 700, also referred to as the "Science and Technology Development Board Seed Capital Bond Act", is unconstitutional for the reasons set forth below.

I.

House Bill 700 was enacted by the legislature in 1987, and has been codified in large part at §§ 90-3-401 through 90-3-420, MCA. When discussing the sections of HB 700 at issue here, we will also cite the appropriate sections of Montana Code Annotated. Section 2 of HB 700 expresses the Act's purpose:

> The legislature finds and declares that:
> (1) it is the policy of the state of Montana to promote the health, safety, and general welfare of all the people of the state;
> (2) such policy will be furthered through strengthening and diversifying the state's economy by facilitating a public-private sector partnership to encourage scientific and technological development within the state in order to keep pace with a changing economic structure and to create new jobs and expand business opportunities; and
> (3) such strengthening and diversification will be fostered by assisting in the acceleration of development of technology in the state through the making of technology investments.

Section 90-3-402, MCA. House Bill 700 was enacted to expand the powers of the Montana Science and Technology Development Board (the Board), which was created by the legislature in 1985 "to strengthen and diversify Montana's economy by establishing a public-private sector partnership to encourage scientific and technological development within the state in order to keep pace with a transforming economic structure and to create new jobs and expand small business opportunities." Section 90-3-101, MCA. House Bill 700 provides the Board with bonding authority to raise money for certain types of "technology investments"; seed capital projects, start-up

3

capital projects and expansion capital projects. Section 15 of the Act provides that the Board shall make at least 20 percent of the "Technology Development Account", funded from bond sales, available for investment in certified Montana capital companies that make technology investments. Section 90-3-415, MCA.

The proceeds received by the Board as the return on its technology investments are to be placed in the "Technology Investment Program Debt Service Fund" to repay the bonds. Section 90-3-404, MCA. Security for bond obligations is provided by the Coal Severance Tax Permanent Trust Fund. Section 90-3-416, MCA.

On November 19, 1987 the Board adopted a resolution that bonds should be issued in accordance with the provisions of HB 700. The Board has been advised that without a Supreme Court ruling that the Act is constitutional, bond counsel cannot render an unqualified opinion that the bonds would be a valid and binding obligation upon the state, and without such an opinion the bonds cannot be successfully marketed.

## II.

The defendants concede issues 1 and 2. They concede that plaintiffs, as taxpayers, have standing under the rule articulated in Grossman v. State (Mont. 1984), 682 P.2d 1319, 41 St.Rep. 804. They also concede that this is an appropriate case for the exercise of this Court's original jurisdiction. The three major factors necessary for a valid exercise of our original jurisdiction are: (1) where constitutional issues of major statewide importance are involved, (2) where the questions involved are purely legal questions of statutory or constitutional construction, and (3) where urgency and emergency factors exist making the normal appeal process inadequate. State ex rel. Greely v. Water Court (Mont. 1984),

4

691 P.2d 833, 41 St.Rep. 2373. We hold that all of these factors have been established.

III.

The plaintiffs contend that HB 700 violates Article V, Section 11, paragraph (5) of the Montana Constitution, which provides:

> No appropriation shall be made for religious, charitable, industrial, educational or benevolent reasons to any private individual, private association or private corporation not under control of the state.

Plaintiffs argue that this section invalidates the technology investments provided for by HB 700 because those investments ultimately benefit private individuals not under control of the state. They rely primarily on Hollow v. State (Mont. 1986), 723 P.2d 227, 43 St.Rep. 1435; and Hill v. Rae (1916), 52 Mont. 378, 158 P. 826, as providing support for their argument. Plaintiffs assert that none of the Montana capital companies or the other various companies or individuals that receive investments are under the control of the state.

Defendants maintain this Court has made it clear that as long as appropriations go directly to a state agency, there is no violation of Art. V, § 11(5), even though the state funds ultimately benefit private persons. Defendants cite Grossman and Huber v. Groff (1976), 171 Mont. 442, 558 P.2d 1124, as their authority. Defendants argue that in this case the appropriations are made to a public agency, the Montana Science and Technology Development Board, which is under the control of the state.

In order to gain perspective on this issue, we will examine the authorities cited by both parties in chronological order. While plaintiffs cite Hill as being dispositive, it was decided in 1916 and was therefore based on the 1889

constitution.   Our consideration of this issue is guided sufficiently by the cases decided post-1972.

Huber was decided in 1976, and concerned legislation enabling the state Board of Housing to sell bonds to help provide housing for low-income individuals and families.   The proceeds from bond sales were to be used in two programs:  (1) to loan money to private lenders on the condition that they in turn lend it to low-income individuals or families, or (2) to purchase mortgages on the condition that the money had been loaned to low-income individuals or families.   We held that the Housing Board was a public corporation, deriving its powers directly from the legislature and following duties prescribed by the legislature. Article V, Section 11(5) was therefore held inapplicable.

Our 1984 decision in Grossman upheld legislation providing that proceeds from the sale of coal severance tax revenue bonds would be loaned to local government entities to finance water development projects.   We cited our decision in Huber, and held that appropriations to public entities were constitutional even though the money might ultimately benefit private individuals or businesses through its use by the state agency.   The state funds involved in Grossman ultimately benefitted private companies and cooperatives that leased new or improved hydroelectric facilities.

However, we established a limit to this principle two years later in Hollow.   Hollow involved the use of bond proceeds by the Montana Economic Development Board to fund economic development projects.   The Development Board was authorized to establish a project guaranty program, under which it could make commitments to guaranty payments on loans, leases or other credit arrangements required for funded projects in return for a fee.   The Board further was authorized to make loans from the Montana in-state investment

6

fund, made up in part of funds from coal severance taxes, to its capital reserve account (securing the bonds issued) and its guaranty fund (securing the loans and other credit arrangements). We held that the use of state tax revenues to secure the private obligations of project participants and the bonds providing funds for the benefit of their businesses violated Art. V, § 11(5), as well as Art. VIII, § 1 and Art. VIII, § 13(1) of the Montana Constitution. We distinguished Huber in that the legislation in Huber specifically did not pledge the credit of the state to secure the bonds being issued. The Hollow legislation in effect directly pledged the credit of the state to secure the bonds and guaranties being used to benefit private business ventures.

House Bill 700 establishes a program similar to that in Hollow. The Science and Technology Development Board is empowered to funnel bond proceeds into private business ventures through technology investments. Defendants rightly argue that the Board is a public corporation, as were the boards in the above cases. Therefore, funds initially appropriated for the Board's use would not be appropriated to "any private individual, private association, or private corporation not under control of the state" in violation of Art. V, § 11(5). However, the significance of this argument would diminish greatly once bonds were issued.

Section 16 of H.B. 700 outlines the Board's financing subsequent to its initial appropriation:

> Transfer of portion of coal severance tax permanent trust fund.
> (1)(a)    There must be deposited into the technology investment program debt service fund from the coal severance tax permanent trust fund maintained pursuant to 17-6-203 such amounts, not to exceed $38 million, as are necessary from time to time, after application of all other money in

7

the technology investment program debt service fund, to pay principle of and premium, if any, and interest on obligations when due.

(b) The chairman of the board shall advise the state treasurer prior to the date on which any payment is due of the amount needed to be transferred.

. . .

(3) The legislature shall provide for the continued assessment, levy, collection, and deposit into the coal severance tax permanent trust fund so there is sufficient money to make the deposits into the technology investment program debt service fund under this section.

Section 90-3-416, MCA. Section 16(3) thus ultimately requires the legislature to make up the difference between the return received by the Board on the investment of bond proceeds and the obligations arising from the bonds. By providing that the legislature shall deposit coal severance tax funds into the Board's debt service fund and assess taxes in order to continue such deposits as needed, § 16(3) in effect pledges the credit of the state to secure the bonds issued by the Board, the proceeds of which are to be used for the benefit of private businesses. As we said in Hollow, "What we do not and cannot condone is the direct use of tax monies by legislative provision which in effect directly pledges the credit of the state to secure the bonds involved in this case." 723 P.2d at 232. We hold, therefore, that § 16(3) of HB 700 violates Art. V, § 11(5) of the Montana Constitution, and is therefore void.

IV.

Plaintiffs assert that HB 700 unconstitutionally delegates legislative power to the Board, violating Article V, Section 1 of the Montana Constitution which provides:

The legislative power is vested in a legislature consisting of a senate and a house of representatives. . .

8

The plaintiffs' position is that HB 700 grants the Board too much discretion. They argue that the powers granted to the Board are not circumscribed sufficiently; i.e., there are no standards or rules from the legislature to guide the Board in making technology investments. Plaintiffs cite Douglas v. Judge (1977), 174 Mont. 32, 568 P.2d 530, as an example of a similar act that was held unconstitutional. Douglas applied the test articulated in Bacus v. Lake County (1960), 138 Mont. 69, 354 P.2d 1056:

> The law-making power may not be granted to an administrative body to be exercised under the guise of administrative discretion. Accordingly, in delegating powers to an administrative body with respect to the administration of statutes, the legislature must ordinarily prescribe a policy, standard, or rule for their guidance and must not vest them with an arbitrary and uncontrolled discretion with regard thereto, and a statute or ordinance which is deficient in this respect is invalid.

Douglas, 568 P.2d at 533-34.

The defendants assert that HB 700 delegates administrative authority to the Board, not legislative power. Defendants cite Huber for the standard that determines whether legislation results in an unconstitutional delegation of legislative power:

> . . . Concerning adequate standards and guides in delegation of legislative power, this court has stated the rule as follows: If the legislature fails to prescribe with reasonable clarity the limits of power delegated to an administrative agency, or if those limits are too broad, its attempt to delegate is a nullity.
>
> On the other hand a statute is complete and validly delegates administrative authority when nothing with respect to a determination of what is the law is left to the administrative agency, and its provisions are sufficiently clear, definite,

9

and certain to enable the agency to know its rights and obligations.

Huber, 558 P.2d at 1132. Defendants claim that HB 700 meets this standard. They point out that the legislation lays down the policy for the Act and prescribes standards to be followed such as the ten criteria set forth at § 90-3-413(1), MCA. They distinguish Douglas, where the Board of Natural Resources and Conservation was authorized to make loans to farmers and ranchers "for any worthwhile project . . . ." Douglas, 568 P.2d at 534. Defendants say HB 700 stands in sharp contrast to the legislation in Douglas and does not grant the same unguided discretion.

The constitutional tests applied in Douglas and Huber were similar in their purpose of preventing the delegation of unbridled authority to an administrative board. Defendants are correct, however, in their assertion that the very lax legislation in Douglas was quite different from that in Huber. In Huber, the plaintiff asserted that the legislature was too vague in defining "persons and families of lower income" when granting the power to assist those persons in obtaining housing. The contested definition read as follows:

"Persons and families of lower income" means persons and families, with insufficient personal or family income who require assistance under this act, as determined by the board, taking into consideration:
(a) the amount of the total personal and family income available for housing needs;
(b) the size of the family;
(c) the eligibility of persons and families under federal housing assistance of any type based on lower income or a functional or physical disability;
(d) the ability of persons and families to compete successfully in the normal housing market and

10

to pay the amount at which private enterprise is providing decent, safe, and sanitary housing;

    (e) the availability and cost of housing in particular areas; and

    (f) needs of particular persons or families due to age or physical handicaps.

Huber, 558 P.2d at 1132. This definition provided an objective standard for the Board to follow when exercising its power. The size of the family, total income available for housing, availability and cost of housing and ability to enter the housing market at the "going rate" were all objective criteria requiring only observation and arithmetical calculation.

The considerations to be used by the Science and Technology Development Board in making technology investments are set forth in Section 13 of HB 700:

> (1) Technology investments may be made from money in the technology development account only upon a favorable determination by the board of:
>     (a) the relevance of the proposed technology development project to the purposes of this part;
>     (b) the prospects for collaboration on the project between public and private sectors of the state's economy in mineral technology, agricultural technology, forestry technology, biotechnology, microelectronics and computer sciences, energy technology, information sciences, and materials science;
>     (c) the prospects for achieving commercial success in general and for creating significant numbers of new jobs in the state in particular;
>     (d) the quality of the specific product and business development methodology proposed;
>     (e) the suitability of any proposed milestone for evaluating progress of technology development project results; and
>     (f) the availability of matching funds required under 90-3-301(2).
> (2) In this evaluation process, the board shall consider the investment's:

(a) job creation potential;
(b) potential benefit for existing industry;
(c) potential for creating new industry; and
(d) involvement of existing institutional research strength or whether it involves a newly targeted technology area with development potential.

Section 90-3-413, MCA. These considerations do not rise to the level of the objective criteria offered in Huber. They are more akin to general policy considerations underlying the entire technology investment program.

For example, "the prospects for achieving commercial success in general and for creating significant numbers of new jobs in the state in particular" are considerations at the heart of the legislature's decision to empower the Board to sell bonds. They are not objective criteria guiding the investment of bond proceeds. In Huber, the legislation at issue went beyond simply directing that individuals and families of lower income should receive housing assistance. The objective guidelines listed above were supplied to guide the administration of that project. Likewise in Grossman, the legislation directed that the feasibility of hydroelectric projects should be considered, and then went on to list objective standards (e.g., estimated costs of necessary improvements, debt servicing requirements and ability of customers to lease improved facilities) by which to judge feasibility. In the case at bar, HB 700 does not set forth the law under which the Board would function. No legislatively defined "policy, standard or rule" is effectively given. Douglas, 568 P.2d at 533.

House Bill 700 also fails to "prescribe with reasonable clarity the limits of power delegated" to the Board. Huber, 558 P.2d at 1132. The statement of purpose in Section 2 asserts that "strengthening and diversification" of Montana's

12

economy "will be fostered...through the making of technology investments." Section 90-3-402, MCA. The linchpin of the legislation is thus the grant of authority to the Board to make technology investments. Yet the term "technology investment" is not well defined in HB 700. Section 90-3-102, MCA, lists definitions to be used throughout Chapter 3 of Title 90, which includes HB 700. Reference to that section, however, is not illuminating. Technology investment is defined only as "an award of funds for a technology development project." On the basis of this definition, the form that such an award might take is left almost entirely to the imagination of the Board. As the plaintiffs point out, the guidelines laid out by HB 700 do not prohibit the Board from holding private corporate capital stock, an arrangement which could violate Art. VIII, Section 13(1) of the Montana Constitution.

Another area where definition is lacking is the terms on which technology investments are to be made. When making an "award of funds," the Board is required to negotiate a "return-on-investment agreement." However, return on investment appears to be as murky a concept as technology investment. Section 23 of HB 700 states that the Board shall enter into return-on-investment agreements requiring payment of "a return that [the Board] considers commensurate with the risk of its original investment." Section 90-3-302, MCA. As with the criteria for investment discussed above, the Board is left to define a policy that should have been contained in HB 700.

Defendants note that the Board has adopted rules that provide controls over the technology investment program, and assert that this Court recognized in Huber that such rules are what defendants characterize as "important indications that the legislation at issue will not be arbitrarily

13

implemented". Even so, our focus remains the authority delegated by the legislature, and whether limits on that authority are clearly prescribed. In Huber, we noted a rule promulgated by the Housing Board showing its ability to place a figure on the income limit for "persons and families of lower income" pursuant to the objective criteria present in that case. However, constitutional law does not allow for an administrative board to legislate the limits of its own power, which the Board in the present case has been required to do in order to give some meaning to the vague terms of HB 700.

Sections 12, 13, 14, 15, and 22 of HB 700 delineate the operations of the Board and the powers it may exercise. Through vagueness or incorporation of inadequately defined operative terms, all of these sections delegate legislative authority to the Board. They violate Art. V, § 1 of the Montana Constitution, and are therefore void.

V.

Plaintiffs assert that the title of the Act violates Article V, Section 11(3) of the Montana Constitution, which requires that

> [e]ach bill, except general appropriation bills and bills for the codification and general revision of the laws, shall contain only one subject, clearly expressed in its title. If any subject is embraced in any act and is not expressed in the title, only so much of the act not so expressed is void.

The plaintiffs argue the title to HB 700 is vague. They assert it is not specific about the details concerning the money committed from the coal severance tax permanent trust fund and it does not mention the Montana capital companies.

The defendants state that the test for compliance with this provision of the Montana Constitution is

> simply whether the title is of such character as to mislead the public [or members of the legislature] as to the subject embraced.

Montana Automobile Association v. Greely (Mont. 1981), 632 P.2d 300, 311. They argue the title gives fair and accurate notice of the subject of the Act to interested parties, and the title need not provide details regarding every aspect of the legislation in order to pass constitutional muster. State v. Driscoll (1936), 101 Mont. 348, 54 P.2d 571.

The full title of HB 700 is as follows:

> An Act providing authority to the Montana Science and Technology Development Board to issue science and technology development seed capital fund bonds to finance technology investments; creating necessary funds and accounts; making statutory appropriations of certain money; authorizing transfer of a portion of the coal severance tax permanent trust fund; providing for audits of the board; amending Sections 17-7-502, 90-3-203, 90-3-302, and 90-3-304, MCA; and providing an immediate effective date.

At no point does this title mention the fact that Section 16(3) of the Act pledges the credit of the State of Montana to secure the bonds to be issued. This would be a subject of importance to legislators preparing to vote on HB 700. As § 16(3) contains a subject of importance not embraced in the title of HB 700, it violates Art. V, § 11(3) of the Montana Constitution, and is therefore void.

VI.

Both parties note the presence of Section 27 in HB 700, which provides for severability:

> If a part of this act is invalid, all valid parts that are severable from the invalid part remain in effect. If a part of this act is invalid in one or more of its applications, the part remains in

15

> effect in all valid applications that are severable from the invalid applications.

In _Greely_, we reviewed Montana case law dealing with severability. The essential principle of severability is that a statute is not entirely voided by inclusion of one or more unconstitutional sections, unless those sections are "necessary to the integrity of the statute or [were] the inducement to its enactment." _Greely_, 632 P.2d at 310, citing _Hill_. Our invalidation of Sections 12, 13, 14, 15, 16(3) and 22 of HB 700 removes the legislative grant of authority to the Board for making technology investments. Those portions of HB 700 remaining are thus rendered meaningless. Accordingly, we declare House Bill 700 to be void in its entirety, as it suffers from constitutional defect in its core provisions. For this reason, it will be unnecessary for us to proceed to the remaining issues posed by the plaintiffs.

This opinion shall constitute a declaratory judgment in favor of the Whites to the effect that:

1. House Bill 700 pledges the credit of the state to secure bonds issued by the Montana Science and Technology Development Board, the proceeds of which would be used for the benefit of private businesses, in violation of Article V, Section 11, paragraph (5) of the Montana Constitution.

2. House Bill 700 delegates legislative power to the Montana Science and Technology Development Board in violation of Article V, Section 1 of the Montana Constitution.

3. The title of House Bill 700 fails to mention the pledge of the credit of the state to secure bonds

issued by the Montana Science and Technology
Development Board found in Section 16(3) of the Act,
in violation of Article V, Section 11, paragraph (3)
of the Montana Constitution.

4. As a result of these constitutional defects, House
Bill 700 is invalid in toto.

This opinion, without the filing of further instruments or
orders, shall constitute such a declaratory judgment.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

17

Mr. Justice John C. Sheehy, concurring:

I concur wholly with the foregoing opinion. It may help to demonstrate the unconstitutional use of state funds for private purposes if we examine some of the investments that are permitted by the law or committed by the Board.

The legislature in 1983 authorized the formation of qualified "Montana Capital Companies" § 90-8-101 et seq., MCA. These companies are authorized to acquire capital from investors, who in turn, if the Capital Company were certified under the Act as qualified, are entitled to a credit upon their state income taxes up to 50 percent of their investment. Under the law, § 90-2-415, MCA, the Board is required to make at least 20 percent of the technology development account available for investment in certified Montana Capital Companies. At the time the proposed law was pending before the legislature, the legislators were told that there were three such qualified Capital Investment Companies in Montana of which one is active. It was proposed that each of these companies would receive approximately one million dollars from the bond issue for capital investment. Thus the investment made by the private investors in the way of contributions to capital in the Capital Investment Company would be leveraged by the sum of one million dollars from money generated originally by coal taxes.

From another aspect, the program developed by the Board four types of investment to which the bond issue funds may be applied, (1) research capability development; (2) applied technology research; (3) technical assistance and technology transfer; (4) and seed capital investment. These programs, except technical assistance and technology transfer, require

18

at least a dollar-for-dollar match with non-state appropriated funds.

Among other commitments, the Board had committed for the period between November 1, 1986 and December 1, 1987 the following "investments" under technology transfer:

| RECIPIENT | LOCATION | DESCRIPTION | AMOUNT |
|---|---|---|---|
| Montana Ambassadors | Helena, MT | Proposal to U.S. West | $50,000 |
| Montana Ambassadors | Helena, MT | Montana Venture Capital Forum | $ 7,500 |
| Montana Wool Growers | Helena, MT | Transfer of Sheep Management Technology | $50,600 |

Clearly, each of the foregoing commitments is the use of state monies for private purposes, because there is no provision for reimbursement nor a dollar for dollar match. However well intended the objectives may have been, these uses of state monies through private agencies clearly offend the Montana Constitution.

John C. Sheehy
_____
Justice

19