No. 98-236 and 99-045

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 342

IN THE PETITION TO TRANSFER TERRITORY FROM HIGH SCHOOL

DISTRICT NO. 6, LAME DEER, ROSEBUD COUNTY, MONTANA,

TO HIGH SCHOOL DISTRICT NO. 1, HARDIN, BIG HORN COUNTY, MONTANA.

_____

MARILYN S. HAYES, ARTHUR F. HAYES, Jr.,et al., consisting of the signators

of the Petitions for Transfer of Territory from Lame Deer High School District to Colstrip

High School District,

Petitioners/ Respondents,

v.

LAME DEER HIGH SCHOOL DISTRICT and NANCY KEENAN, in her

capacity as MONTANA SUPERINTENDENT OF PUBLIC INSTRUCTION,

Respondents/ Appellants.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Big Horn,

The Honorable Diane G. Barz, Judge presiding. (98-236)

District Court of the Sixteenth Judicial District,

In and for the Count of Rosebud,

The Honorable Joe L. Hegel, Judge presiding. (99-045)

COUNSEL OF RECORD:

For Appellants:

Richard J. Dolan, Goetz, Gallik, Baldwin & Dolan, Bozeman, Montana

For Respondents:

Laurence R. Martin, Felt, Martin, Grazier, Jacobs & Rapkoch, Billings, Montana (98-236);
George W. Huss, Brown & Huss, Miles City, Montana (99-045)

Heard: January 25, 2000

Submitted: February 15, 2000

Decided: December 19, 2000

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

¶1 Lame Deer High School District appeals the decisions of the Thirteenth Judicial District Court, Big Horn County, and the Sixteenth Judicial District Court, Rosebud County, which reversed the decisions of the State Superintendent and affirmed the County Superintendents' decisions to grant a transfer of territory from Lame Deer High School District. We reverse the decisions of the District Courts.

¶2 The appellants raise several issues, but we find the dispositive issue on appeal to be whether the school territory transfer statute, § 20-6-320, MCA, is an unconstitutional delegation of legislative power.

# FACTUAL BACKGROUND

¶3 Lame Deer High School District (LDHSD) was created in 1993 after extensive hearings and testimony. In February of 1991, after petitions were filed to create the new district, the County Superintendents of Schools of both Big Horn and Rosebud Counties held hearings. After both County Superintendents denied the petitions to create LDHSD, the State Superintendent of Public Instruction issued a notice of hearing, consolidated the appeals, and an independent hearing examiner conducted further hearings on the matter. The hearing examiner issued an order; the parties were allowed to file exceptions and present oral arguments. On November 9, 1993, after consideration of this record, the State Superintendent issued her order creating LDHSD.

¶4 The non-voted mill levy assessed in LDHSD is currently about 34 mills, which is close to the statewide average, and which is less than predicted by the State Superintendent when she created the new district. The assessed taxable valuation of the territory belonging in LDHSD is approximately $2,111,689. The transfer sought to be made here will remove approximately $1.6 million through the Rosebud County territory transfer and approximately $325,000 will be removed by the Big Horn County territory transfer.

¶5 LDHSD includes land from the Colstrip and Hardin High School Districts in both Rosebud and Big Horn Counties, including lands within and outside of the borders of the Northern Cheyenne Reservation. The territories proposed for transfer in this consolidated case border the Northern Cheyenne Indian Reservation on three sides. Transferring both the Rosebud and Big Horn territories from LDHSD would leave the district with only $161,000 in taxable valuation, all within the Northern Cheyenne Indian Reservation.

¶6 In 1994, individuals residing in both Rosebud and Big Horn Counties, but outside of the Northern Cheyenne Indian Reservation (collectively "Respondents"), petitioned their respective County Superintendents of Schools requesting a territory transfer from LDHSD back to the Colstrip and Hardin High School Districts. Both County Superintendents of Schools held hearings, and both granted the Respondents' requests to transfer territory from LDHSD pursuant to § 20-6-320, MCA (1993).

¶7 LDHSD appealed these decisions to the State Superintendent of Public Instruction, who reversed the County Superintendents' decisions. From that determination, Respondents appealed to their respective District Courts. Both District Courts reversed the State

Superintendent's decisions. LDHSD now appeals from the District Courts' decisions. In February of 1999, we consolidated the cases.

## DISCUSSION

¶8 The dispositive issue on appeal is whether § 20-6-320, MCA, which gives authority to county superintendents of schools to grant or deny petitions to transfer territory among school districts, is an unconstitutional delegation of legislative power.

¶9 Our review of issues involving constitutional law is plenary. State v. Bedwell, 1999 MT 206, ¶ 4, 295 Mont. 476, ¶ 4, 985 P.2d 150, ¶ 4. A statute, however, is presumed to be constitutionally valid. Ingraham v. Champion Intern. (1990), 243 Mont. 42, 46-47, 793 P.2d 769, 772. The party challenging the constitutionality of a statute has the burden of overcoming this presumption. McClanathan v. Smith (1980), 186 Mont. 56, 65, 606 P.2d 507, 512.

¶10 Respondents argue that this issue is not properly before this Court because it was not raised in the District Courts. LDHSD counters that while this issue is being raised for the first time on appeal both the law and the procedural posture of the case support their position that this Court should review the issue. LDHSD argues that broad public concerns are involved which effect the substantial rights of the litigants and that the only time this issue could have been raised in this case was on appeal.

¶11 In general, this Court does not consider issues raised for the first time on appeal. Reno v. Erickstein (1984), 209 Mont. 36, 41, 679 P.2d 1204, 1207; Day v. Payne (1996), 280 Mont. 273, 276, 929 P.2d 864, 866. It appears, however, that substantial rights of the litigants are at stake here. Their school district boundaries and tax burden have been affected by a potentially unconstitutional delegation of power to the County Superintendents. Further, the procedural posture of this case is unique. This matter began as an administrative case before the County Superintendent who did not consider any constitutional issues. On appeal, the State Superintendent refused to consider constitutional issues. Even if LDHSD had raised this issue in the District Courts, it still would have been raised for the first time on appeal.

¶12 LDHSD argues that the County Superintendent's change of the boundaries of LDHSD was an exercise of legislative power. We have previously held that the authority to alter school district boundaries is legislative in nature. The authority to make school district

boundaries is entirely within the power of the legislature. Read v. Stephens (1948), 121 Mont. 508, 512, 193 P.2d 626, 628. Montana law on this issue is consistent with those of sister states. *See, e.g.*, School District No. 46 v. City of Bellevue (Neb. 1987), 400 N.W.2d 229, 235; State *ex rel.* Dix v. Board of Education (Kan. 1974), 527 P.2d 952, 955; Dunker v. Brown County Board of Education (S.D. 1963), 121 N.W.2d 10, 13; Hazlet v. Gaunt (Colo. 1952), 250 P.2d 188, 194; State v. Hines (Kan. 1947), 182 P.2d 865, 868.

¶13 Section 20-6-320, MCA, grants local county superintendents the power to transfer territory from one school district to another. Section 20-6-320, MCA, gives the county superintendents the authority to alter the boundaries of school districts, constituting a delegation of legislative power. The legislature may constitutionally delegate its legislative functions to an administrative agency, but it must provide, with reasonable clarity, limitations upon the agency's discretion and provide the agency with policy guidance. City of Missoula v. Missoula County (1961), 139 Mont. 256, 259, 362 p.2d 539, 541.

¶14 Article III, Section 1, of the 1972 Montana Constitution (formerly Article IV, Section 1, 1889 Montana Constitution) provides:

> Separation of powers. The power of the government of this state is divided into three distinct branches-legislative, executive, and judicial. No person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.

¶15 In Bacus v. Lake County (1960), 138 Mont. 69, 354 P.2d 1056, we set the standard for a delegation of legislative power. We stated the rule as follows:

> The law-making power may not be granted to an administrative body to be exercised under the guise of administrative discretion. Accordingly, in delegating powers to an administrative body with respect to the administration of statutes, the legislature must ordinarily prescribe a policy, standard, or rule for their guidance and must not vest them with an arbitrary and uncontrolled discretion with regard thereto, and a statute or ordinance which is deficient in this respect is invalid.

*Bacus, 138 Mont. at 78, 354 P.2d at 1061. A statute granting legislative power to an administrative agency will be held to be invalid if the legislature has failed to prescribe a*

*policy, standard, or rule to guide the exercise of the delegated authority. If the legislature fails to prescribe with reasonable clarity the limits of power delegated to an administrative agency, or if those limits are too broad, the statute is invalid. See Matter of Auth. to Conduct Sav. & Loan Act., Etc. (1979), 182 Mont. 361, 369-70, 597 P.2d 84, 89; Douglas v. Judge (1977), 174 Mont. 32, 38, 568 P.2d 530, 534; Plath v. Hi-Ball Contractors, Inc. (1961), 139 Mont. 263, 272, 362 P.2d 1021, 1025; City of Missoula, 139 Mont. at 259, 362 P.2d at 540-41.*

¶16 LDHSD argues that the statute's delegation of power is unconstitutional because it gives the county superintendents unfettered discretion in determining whether to transfer territory. Further, the statute's only directive is that the decision must be based on the effects of a transfer on both those living in the territory proposed for transfer and those living in the remaining territory. LDHSD argues that the legislature must give more guidance than this broad discretionary language. Respondents counter that the detailed procedure involved in petitioning for a territory transfer expressly constrains the county superintendents' ability to act.

¶17 The legislature has established a number of conditions which must be satisfied before a petition may be considered by a county superintendent of schools. Satisfaction of these conditions, however, does not require granting of a petition. Section 20-6-320, MCA (1993), is as follows:

(1) A majority of registered electors of a high school district who reside in territory that is a part of a high school district may petition the county superintendent to transfer the territory in which they reside to another high school district if:

(a) the territory to be transferred is contiguous to the high school district to which it is to be attached;

(b) the territory to be transferred is not located within 3 miles, over the shortest practical route, of an operating school of the high school district from which it is to be detached;

(c) the transfer of the territory will not reduce the taxable value of the district to less than $300,000 unless the remaining territory of the high school district contains not less than 50,000 acres of nontaxable Indian land;

(d) the board of trustees of the school district that would receive the territory has approved the proposed transfer in writing; and

(e) the territory proposed to be transferred to another high school district has not been included in a petition filed under this section in the previous 3 years. . . .

(6) Within 30 days after the hearing, the county superintendent shall, after considering the testimony and exhibits presented at the hearing, issue findings of fact, conclusions of law, and an order. The county superintendent shall grant or deny the requested transfer of territory. The decision must be based on the effects that the transfer would have on those residing in the territory proposed for transfer as well as those residing in the remaining territory of the high school district. . . .

This statute's only directive on whether to grant or deny a petition is that "the decision must be based on the effects that the transfer would have on those residing in the territory proposed for transfer as well as those residing in the remaining territory of the high school district." Section 20-6-320(6), MCA (1993) (statute was amended in 1997, causing the difference in subsection numbers, but the language at issue remains the same). The territory transfer statute does not constrain a county superintendent's discretion in whether to grant or deny a transfer. The decision is left up to the county superintendent's unguided judgment.

¶18 While this statute sets forth some criteria, the satisfaction of these conditions does not limit a county superintendent's discretion in granting or denying a petition once the procedural requirements have been met. This statute fails to provide any checks on the discretion of the county superintendent of schools in deciding whether to grant a territory transfer. The statute's only directive is that the county superintendent should make the decision based on the effects felt by those transferred and those remaining. Section 20-6-320(6), MCA (1993). The legislature has provided no criteria for balancing the effects felt by the parties involved in a school district territory transfer. Instead, the decision is left solely to the whim of the local county superintendents.

¶19 It is this broad grant of discretion to a county superintendent of schools, unchecked by any standard, policy or rule of decision, that renders the territory transfer statute unconstitutional. In *Bacus* we stated that "the standard must not be so broad that the officer or board will have unascertainable limits within which to act." *Bacus*, 138 Mont. at 81, 354 P.2d at 1062. If the legislature had limited a county superintendent to the role of

fact finder or if the legislature had set forth the specific criteria to be weighed when deciding to grant or deny a petition, the statute would have conformed to constitutional requirements.

¶20 We hold that § 20-6-320, MCA, is an unconstitutional delegation of legislative power. The decisions of the District Courts are reversed.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ J. A. TURNAGE

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

/S/ W. WILLIAM LEAPHART

Justice James C. Nelson specially concurs.

¶21 I specially concur in our opinion. I write separately, first, because I believe that the dissent's criticism of the procedural component of our opinion is unfounded and, second, because I have my own rationale for concluding that § 20-6-320(6), MCA[1] is unconstitutional beyond a reasonable doubt. In sum, I believe that we are correct in addressing this issue; I believe that we are correct in holding the statute unconstitutional; and, finally, I believe that the Legislature can amend the statute to cure its constitutional infirmities by articulating reasonably clear and definite standards, objective criteria and ascertainable limits to guide the county superintendent's exercise of discretion in territory transfer cases.

I.

¶22 First, there is the contention that the constitutional issue is being raised for the first time on appeal contrary to our general rule that dictates we not address issues and theories unless first raised in the trial court. There are at least two sound legal reasons which militate against following the usual rule in this case.

¶23 As noted by the Court, there is a "substantial rights" exception to the general rule. In *Matter of N.B.* (1980), 190 Mont. 319, 323, 620 P.2d 1228, 1231, we stated:

> This Court reserves to itself the power to examine constitutional issues that involve broad public concerns to avoid future litigation on a point of law. We reject the State's argument that this appeal should be dismissed for failure to raise these issues for the first time on appeal if the alleged District Court error affects the substantial rights of a litigant. [Citation omitted.]

This exception to the no-review rule is discretionary, and we interpret "substantial rights" narrowly. *Reno v. Erickstein* (1984), 209 Mont. 36, 42, 679 P.2d 1204, 1207. Notwithstanding, I believe that this case fits within the exception.

¶24 Public education and how school districts are drawn, administered, and financed implicate broad public concerns--concerns that are the subject of continuing, intense, popular, and legislative scrutiny statewide. Moreover, as part II of this separate opinion demonstrates, these same matters significantly impact the rights of educational opportunity guaranteed under Article X, Section 1 of the Montana Constitution and, thus, the substantial rights[(2)] of the litigants here.

¶25 Additionally, this case is one of three school district territory transfer cases presently before this Court. *See In re the Petition to Transfer Territory from Belgrade Elementary and High School District No. 44 to Monforton Elementary District No. 27 and Bozeman High School District No. 7*, No. 99-687; *Belgrade Elementary and High School District No. 44 v. Alan and Cindy Morris, Bozeman Elementary and High School District No. 7 and Gallatin County Superintendent of Schools Jill Richards*, No. 99-395. In these latter two cases, the unconstitutional delegation issue was raised and briefed below. And, while it might be argued that, to avoid the criticism of the dissent, we should address this issue in one of those two cases, the fact remains that if the statute is unconstitutional for one case, it is unconstitutional for all cases. In practical terms, it simply does not matter which case serves as the vehicle to articulate the dispositive rule of law which governs all three. Moreover, since the instant case was the first of the three to advance through the opinion writing stage, (and the only one orally argued), it makes good sense to give the Legislature as much lead time as possible in which to consider and adopt amendments to the statute, if that body chooses to do so.

## II.

¶26 That said, I turn next to the substance of the statute at issue.

¶27 Section 20-6-320, MCA (1993), allows territory comprising a high school district to be transferred from one contiguous district to another. Subsection (1) of the statute provides certain specific criteria as to the territory to be transferred, as to the territory remaining and as to the receiving district. Subsection (2) provides certain information that must be included in the transfer petition and for a $50 (now $100) filing fee. Like those in subsection (1), these requirements are black and white and require no exercise of discretion. Under subsection (3), a petition that meets the statutory criteria specified in subsection (1) and contains the information required by subsection (2) is valid; one that does not meet these criteria or contain this information is invalid.

¶28 Subsections (3), (4) and (5) set out how the county superintendent is to proceed procedurally after a valid petition is filed. Subsections (7) and (8) also contain other procedural requirements. None of these procedural requirements are at issue here.

¶29 As noted by the majority, subsection (6) of the statute presents the constitutional infirmity. This subsection provides:

> Within 30 days after the hearing, the county superintendent shall, after considering the testimony and exhibits presented at the hearing, issue findings of fact, conclusions of law, and an order. The county superintendent shall grant or deny the requested transfer of territory. *The decision must be based on the effects that the transfer would have on those residing in the territory proposed for transfer as well as those residing in the remaining territory of the high school district.*

Section 20-6-320(6), MCA (1993) (emphasis added).

¶30 Subsection (6) completely fails to provide any objective legislative standard, policy, instruction, criteria, or requirements as to what sort of "effects" are to guide the county superintendent in exercising his or her power to grant the petition to transfer or to deny the petition. There is no legislative direction as to what "effects" the county superintendent, at a minimum, is to consider. For example, is he or she to consider the effect of the transfer on educational opportunity and quality; on property taxes; on taxable valuation; on fiscal stability and bonding capacity; on student transportation; on plant capacity; on class size; on student, teacher and staff morale; on sports and extracurricular activities; on local control; on racial, cultural, social, economic and demographic diversity or homogeneity;

on district geography and on the communities and infrastructure of the transferring and receiving districts? Is he or she to consider all of the above, some of the above, none of the above? Is he or she to consider other "effects" instead of or in addition to the above?

¶31 Moreover, the statute fails to provide any legislative direction as to how, substantively, the county superintendent is to evaluate the types of "effects" that transfer might implicate. Which "effects" are important; which are less important; under what criteria are competing "effects" to be balanced; and are there certain "effects" that must exist--or may not exist--before a transfer petition can be granted or denied? Is some sort of cost-benefit-burden analysis appropriate or necessary? Is the county superintendent required to determine whether the relief sought by the petitioners could be accomplished by some mechanism short of disturbing existing school district boundaries so as to avoid the consequent "effects" of transfer on the tax base and operations of both districts?

¶32 The statute does not set out who--the petitioners or the opponents of transfer--bears the burden of proof of the "effects." The statute simply provides that a majority of the resident electors in territory that is part of a district may petition to transfer the territory in which they reside to another district. Aside from there being no definition as to what constitutes "territory"--i.e., is it some percent of the total territory in the district or can it be one family's lot or farm?--the statute fails to specify whether this "majority" has any obligation to actually offer evidence or prove any "effects." The statute does not articulate a standard of proof. Are the "effects"--assuming some obligation of proof--to be demonstrated by a preponderance of the evidence; by clear and convincing evidence; or by some other standard?

¶33 In short, one cannot read subsection (6) without being reminded of the old fast-food commercial:

> Customer: "What's in the chicken sandwich?"
>
> Counter person: "Parts."
>
> Customer: "What kind of parts?"
>
> Counter person: "Parts is parts."

In context, the same question can be asked: What's in this statute? Unfortunately, the

answer is the same: "Effects is effects."

¶34 Under this statute, the Legislature has effectively given the county superintendent *carte blanche* to make virtually any decision he or she wishes. In default of specifying legislative standards, one locally-elected official has been statutorily granted free reign to transfer "territory"--whatever that is--from one school district to another (or to deny a transfer) so long as the decision is based on the "effects" of the transfer. There is no apparent legislative concern as to the significance, relevance or legitimacy of those "effects"--only that there be some. The statute delegates completely unfettered discretion to the administrative official whether to transfer or to not transfer territory. The statute completely fails to set out any reasonably clear and ascertainable limits, objective criteria or clear and definite legislative standards to control the county superintendent's exercise of discretion and decision-making authority.

¶35 As a result, this scheme allows, if not encourages, arbitrary and capricious decisions based on political expediency instead of on considerations emphasizing thoughtful and fiscally responsible school district administration and, most importantly, insuring the best educational opportunity for the students affected. By virtue of the non-existence of legislative criteria as to the nature and significance of the "effects" the county superintendent is to consider, these statutes promote litigation between school districts with the attendant non-educationally related cost and expense that no school district in this State can realistically afford.

¶36 There being no formal "parties" to school district territory transfer disputes, the "forum" for these sorts of proceedings constitutes little more than a public hearing before the county superintendent. Such a format is better suited to exchanges of opinions and rhetoric by any resident, taxpayer or district representative that wants a say, than to the receipt from knowledgeable witnesses of relevant, probative testimony and hard evidence on the "effects" of the transfer on each district.

¶37 Moreover, this scheme defies any meaningful review of the county superintendent's determination because there are no legislative standards against which to judge his or her decision. So long as the county superintendent's decision is based on the "effects" of the transfer, who is to say that the county superintendent is right or wrong? One "effect" is as good or as bad as another "effect." One district's beneficial "effect" is the other district's detrimental "effect." "Effects" may be important or they may be trivial. The "effects" may impact many district residents or they may be personal only to the petitioners. But, so

what? "Effects is effects."

¶38 If logic and common sense do not condemn such a perverse statutory scheme, the law does. Thus, it is to this law that I now turn.

## III.

¶39 In *Read v. Stephens* (1948), 121 Mont. 508, 512, 193 P.2d 626, 628, we held that "[t]he power exercised by the administrative boards or officials in changing the boundaries of school districts is usually termed legislative power . . . ." We also concluded that the statutory language permitting the county superintendent to grant a transfer petition "if he deem it advisable and for the best interest of the territory proposed to be transferred or included" delegated to the country superintendent of schools and to the board of county commissioners "a full measure of discretionary power in creating and changing the boundaries of school districts." *Read*, 121 Mont. at 513, 193 P.2d at 629. Unfortunately, however, we did not directly address the issue framed in the case at bar--i.e., whether the statutory language accorded with the constitutional requirement that delegation of authority to an administrative officer by the Legislature must be accompanied with objective, clear and ascertainable standards on how that authority should be exercised.[3]

¶40 As the Court's opinion notes, however, this issue was addressed in *Bacus v. Lake County* (1960), 138 Mont. 69, 79-80, 354 P.2d 1056, 1061-62, wherein we declared unconstitutional a statute that delegated to county and district boards of health the power to enact rules and regulations "pertaining to the prevention of disease and the promotion of public health."

¶41 Citing the "Separation of Powers" provision, Article IV, Section 1 of the 1889 Montana Constitution (virtually identical to Article III, Section 1 of the 1972 Montana Constitution), we stated:

When the legislature confers authority upon an administrative agency it must lay down the policy or reasons behind the statute and also prescribe standards and guides for the grant of power which has been made to the administrative agency. The rule has been stated as follows:

"The law-making power may not be granted to an administrative body to be exercised under the guise of administrative discretion. Accordingly, in delegating

powers to an administrative body with respect to the administration of statutes, the legislature must ordinarily prescribe a policy, standard, or rule for their guidance and must not vest them with an arbitrary and uncontrolled discretion with regard thereto, and a statute or ordinance which is deficient in this respect is invalid. In other words, in order to avoid the pure delegation of legislative power by the creation of an administrative agency, the legislature must set limits on such agency's power and enjoin on it a certain course of procedure and rules of decision in the performance of its function; and, if the legislature *fails to prescribe with reasonable clarity the limits of power delegated to an administrative agency, or if those limits are too broad*, its attempt to delegate is a nullity.

"* * * On the other hand, a statute is complete and validly delegates administrative authority when nothing with respect to a determination of what is the law is left to the administrative agency, and *its provisions are sufficiently clear, definite, and certain to enable the agency to know its rights and obligations.*"

*Bacus,* 138 Mont. at 78-79, 354 P.2d at 1061 (emphasis in original) (quoting 73 C.J.S. *Public Administrative Bodies and Procedure § 29 at 324-25).*

¶42 We observed that the statutory language at issue in *Bacus* was not sufficiently definite to lay down proper standards for the guidance of the administrative agency and that the Legislature's intention could not be discerned from the language which it used in delegating rule-making authority to the boards. We also pointed out that "the validity of a statute is determined by what may be done under it not what has been done under it." *Bacus,* 138 Mont. at 79, 354 P.2d at 1061 (citation omitted).

¶43 Finally, citing *State v. Stark* (1935), 100 Mont. 365, 371, 52 P.2d 890, 892, we stated:

"Delegation of power to determine who are within the operation of the law is not a delegation of legislative power. * * * But it is essential that the Legislature shall fix some standard by which the officer or board to whom the power is delegated may be governed, and not left to be controlled by caprice."

We agree with this statement of the law and go further by saying that the standard must not be so broad that the officer or board will have unascertainable limits within which to act. The statute in the case at bar is too broad to prescribe with reasonable clarity the limits within which the officer or board may act.

*Bacus, 138 Mont. at 81, 354 P.2d at 1062.*

¶44 We have continued to follow the *Bacus* Court's reasoning in other cases where the Legislature has too broadly delegated its authority to administrative agencies. *See Plath v. Hi-Ball Contractors, Inc.* (1961), 139 Mont. 263, 362 P.2d 1021 (declaring unconstitutional a statute which delegated to city-county planning boards complete discretion in the development of master plans for the contiguous unincorporated area within a 12-mile radius of the city); *Douglas v. Judge* (1977), 174 Mont. 32, 568 P.2d 530 (holding unconstitutional a statute authorizing the Department of Natural Resources to make loans to farmers and ranchers who proposed "worthwhile" renewable resource development programs); *In the Matter of Savings & Loan Activities* (1979), 182 Mont. 361, 597 P.2d 84 (declaring unconstitutional a statute granting the Department of Business Regulation the power to approve or disapprove applications for the merger of savings and loan associations); *Shannon v. City of Forsyth* (1983), 205 Mont. 111, 666 P.2d 750 (holding that a zoning ordinance requiring the approval of 80% of landowners residing within 300 feet of a particular property before a variance may be granted, was an unconstitutional delegation of legislative authority); *White v. State* (1988), 233 Mont. 81, 759 P.2d 971 (declaring that the Legislature unconstitutionally delegated authority to the Science and Technology Development Board).

¶45 *White* even more dramatically points up the constitutional infirmities in the school district territory transfer statute at bar. In *White,* the legislation at issue actually set out a whole list of criteria to be used by the Science and Technology Development Board in making technology investments. These considerations included:

(1) Technology investments may be made from money in the technology development account only upon a favorable determination by the board of:

(a) the relevance of the proposed technology development project to the purposes of this part;

(b) the prospects for collaboration on the project between public and private sectors of the state's economy in mineral technology, agricultural technology, forestry technology, biotechnology, microelectronics and computer sciences, energy technology, information sciences, and materials science;

(c) the prospects for achieving commercial success in general and for creating

significant numbers of new jobs in the state in particular;

(d) the quality of the specific product and business development methodology proposed;

(e) the suitability of any proposed milestone for evaluating progress of technology development project results; and

(f) the availability of matching funds required under 90-3-301(2).

(2) In this evaluation process, the board shall consider the investment's:

(a) job creation potential;

(b) potential benefit for existing industry;

(c) potential for creating new industry; and

(d) involvement of existing institutional research strength or whether it involves a newly targeted technology area with development potential.

*White, 233 Mont. at 89-90, 759 P.2d at 976.*

¶46 Notwithstanding, even with this detail we held that these considerations did not rise to the level of objective criteria, but were more akin to general policy considerations underlying the entire technology investment program. The legislation was constitutionally deficient[4] because "[n]o legislatively defined 'policy, standard or rule' [was] effectively given" and because the bill failed to"'prescribe with reasonable clarity the limits of power delegated.'" *White* 233 Mont. at 90, 759 P.2d at 976 (citation omitted).

¶47 If the detailed list of considerations set out in the legislation at issue in *White* was not sufficiently definite and clear enough to pass constitutional muster for legislative delegation of authority purposes, how much further then from the permissible standard is the school district territory transfer statute at issue in the case *sub judice*? The answer is self-evident. This statute permits the administrative official to grant or deny a petition merely "based on the effects that the transfer would have on those residing in the territory proposed for transfer as well as those residing in the remaining territory of the high school

district." Section 20-6-320(6), MCA. In fact, it is difficult to imagine broader discretionary language. Purely and simply, in enacting subsection (6), the Legislature failed to prescribe any objective policy, standard, or rule of decision to limit the county superintendent's exercise of discretion. *See White*, 233 Mont. at 90, 759 P.2d at 976. Moreover, subsection (6) of § 20-6-320, MCA, is so broad that the county superintendent has no reasonably clear and ascertainable limits within which to act. *See Bacus*, 138 Mont. at 81, 354 P.2d at 1062.

¶48 Under this statute, the county superintendent can make his or her decision for a good reason, for a bad reason, or for no reason at all. Provided his or her decision is based on the "effects" of the transfer on the residents of the territories involved and assuming he or she says his or her decision is based on the "effects," legally it matters not what or how he or she decides. This is so, because there is no objective, clear and certain legislative direction as to what "effects" he or she is to consider and as to how he or she is to judge the significance, relevance and legitimacy of those "effects" as to the losing and gaining districts.

¶49 Moreover, any judicial review of his or her decision--our appellate review included--is necessarily little more than an exercise in the judiciary substituting its judgment for that of the county superintendent's. Since the statute fails to include any objective, legislative policy, standard, or rule of decision as to what "effects" are to be considered, reviewing courts have no basis for determining whether the county superintendent met or missed the mark. There is no yardstick by which to determine whether his or her decision was arbitrary or capricious; wrong or right.

¶50 In short, the county superintendent's decision may have no real meat in it at all. It might well be made up of little more than beaks and claws and gizzards and eyeballs. But, under this statute, that's all right because "Parts is parts," and "Effects is effects."

¶51 The language of the territory transfer statute at issue cannot pass the test of constitutionality under either Article III, Section 1, or Article V, Section 1 of the Montana Constitution. For that reason, I agree that § 20-6-320(6), MCA, is unconstitutional beyond a reasonable doubt.

¶52 I concur.

/S/ JAMES C. NELSON

Justice W. William Leaphart joins in the forgoing special concurrence.

/S/ W. WILLIAM LEAPHART

Justice Karla M. Gray, dissenting.

¶53 I respectfully dissent from the opinions of both the Court and Justice Nelson on the threshold question of whether the constitutional issue on which the Court resolves the present case is properly before us. As a result, I would not reach in this case the substantive issue of whether § 20-6-320(6), MCA (1993), is an unconstitutional delegation of legislative power. I would affirm the District Courts on the issues properly before us.

¶54 With regard to whether the constitutional issue raised by LDHSD is properly before us, our general rule requires us to decline to consider issues raised for the first time on appeal. *See Day*, 280 Mont. 273, 929 P.2d 864. The LDHSD having conceded that it is raising this constitutional issue for the first time on appeal to this Court, I would decline to address it.

¶55 With regard to the Court's notion that the procedural posture of this case is "unique," I disagree. It goes without saying that this Court receives many appeals from judicial review by district courts of final agency decisions.

¶56 Nor do I agree with the Court that the earliest the LDHSD could have raised the constitutional issue was in the District Courts and, consequently, the issue would have been raised "for the first time on appeal" there, thus rendering it somehow permissible for this Court to resolve the issue here and now. Under §§ 20-6-320 and 20-3-107, MCA (1993), a county superintendent's decision is "appealable" to the state superintendent of public instruction. The state superintendent's decision is the final administrative order. *See* § 20-3-107(2), MCA (1993). In its appeals to the state superintendent, LDHSD raised at least one constitutional issue and the state superintendent properly left that issue for resolution by the courts. The District Courts, noting that the constitutional issue had been raised, addressed it and, as a result, that issue was properly preserved for consideration by this Court. LDHSD could have done the same with its "unconstitutional delegation" issue; it did not do so.

¶57 Moreover, the remedy for one purportedly aggrieved by a final agency decision is "judicial review," pursuant to the Montana Administrative Procedure Act (Act), not "appeal," as stated by the Court. *See* § 2-4-702(1)(a), MCA (1993). In that regard, § 2-4-702(1)(b), MCA (1993), of the Act expressly provides that a party proceeding before an agency under the terms of a particular statute may not be precluded from questioning the validity of that statute on judicial review. Thus, the Act specifically allows a challenge to a statute on "judicial review," even if not raised prior to that stage. LDHSD clearly was entitled, by law, to raise the "unconstitutional delegation" argument on judicial review in the District Courts and such an action would not constitute raising an issue for the first time on "appeal." LDHSD had a second opportunity to raise this issue and failed to do so. I would not give it a third bite of the apple in this Court at this time in derogation of our general rule that we will not address an issue raised for the first time here.

¶58 Finally, the Court's broad language suggesting that the general no-review rule contains an exception when "substantial rights of the litigants are at stake" is set forth without any legal basis. Fortunately, Justice Nelson's special concurrence fills this hole in the Court's opinion by providing decisional authority. It also, however, clarifies that the "substantial rights" exception to the no-review rule is interpreted narrowly and is discretionary with this Court. I would focus on the rationale behind the exception, which relates to avoiding future litigation on a point of law, rather than merely the "affects substantial rights" language. *See N.B.*, 190 Mont. at 323, 620 P.2d at 1231. As Justice Nelson points out, other cases pending before us properly preserved the issue regarding the constitutionality of § 20-6-320(6), MCA (1993). We could, and should, address the issue in one of those cases. Under the circumstances of these cases, the underlying rationale for the exception to the no-review rule-avoiding future litigation-simply does not support discretionary application of the exception here, particularly given another important principle applied by this Court, that we avoid constitutional issues whenever possible. *See*, *e.g.*, *State v. Still* (1995), 273 Mont. 261, 902 P.2d 546.

¶59 Furthermore, the no-review exception raises serious concerns of its own. Presumably, "substantial rights" always can be argued in the context of a constitutional issue, given lawyers' creativity in crafting arguments. Consequently, the exception's application may well overwhelm and engulf the no-review rule, which is premised on the unfairness to district courts which results when this Court considers an issue not previously raised, and reverses-as the Court does here-a district court on an issue never presented to that court for resolution.

¶60 The dispositive questions properly before us, at the bottom line, are (1) whether the county superintendents' decisions to grant a transfer of territory were arbitrary or capricious; (2) whether the state superintendent applied the proper standard on appeal of those decisions; and (3) whether the District Courts erred in concluding that the territory transfers did not constitute racial discrimination in violation of the equal protection clause of the Fourteenth Amendment to the U.S. Constitution. I would resolve all three questions in the negative and affirm the District Courts. I dissent from the Court's failure to do so.

/S/ KARLA M. GRAY

1. All references to this statute in this separate opinion are to the 1993 version of the Montana Code. I note, however, that the language at issue is included in the 1995, 1997 and 1999 versions of § 20-6-320, MCA, as well, not to mention in the statute pertaining to transferring territory from one elementary school district to another. *See* § 20-6-213, MCA.

2. While we have not had the opportunity to characterize the educational rights that are protected under Montana's Constitution, two members of this Court--the writer of this separate opinion and Justice Leaphart--have stated that they believe the educational rights protected by Article X, Section 1 of the Montana Constitution, are fundamental constitutional rights. *See Kaptein v. Conrad School Dist.*(1997), 281 Mont. 152, 163, 931 P.2d 1311, 1318 (Nelson, J., specially concurring).

3. Similarly, we did not address this constitutional issue in *Gunderson v. Board of County Commissioners* (1979), 183 Mont. 317, 599 P.2d 359 (upholding a decision made under the elementary school district transfer statute).

4. In this case we held that the improper delegation of legislative authority violated Article V, Section 1 of the 1972 Montana Constitution (legislative power is vested in the Legislature). *White,* 233 Mont. at 92, 759 P.2d at 977.